AMERICAN TRUCKING ASSOCIA-
TIONS, INC., Pennsylvania Motor
Truck Association, Maryland Motor
Truck Association, Coastal Tank Lines,
Inc., CRST, Inc., Smith Transfer Corp.,
Ryder Truck Lines, Inc., and Preston
Trucking Corp., Plaintiffs,

v.

Thomas D. LARSON, Secretary of the De-
partment of Transportation of the Com-
monwealth of Pennsylvania, et al., De-
fendants,

v.

Steamship Operators Intermodal
Committee, Plaintiff-Intervenor.

Civ. A. No. 80–899.

United States District Court,
M. D. Pennsylvania.

June 10, 1981.

Arthur R. Littleton, Thomas A. Schneider, Philadelphia, Pa., for plaintiffs.

Eugene Pepinsky, Harrisburg, Pa., and Robert E. Konchar, Cedar Rapids, Iowa, James A. Romanelli, John F. Goryl, Harrisburg, Pa., for CRST, Inc.

Fred Speaker, Lewis S. Kunkel, Jr., Robert J. Attaway, Pepper, Hamilton & Scheetz, Harrisburg, Pa., Seymour H. Kligler and Mel P. Barkan, New York City, for Steamship Operators Intermodal Committee.

John L. Heaton, Asst. Atty. Gen. Chief Counsel, Harrisburg, Pa., for Daniel F. Dunn.

Michael Deckman, Harrisburg, Pa., for Thomas Larson.

Edward A. Woolley, New York City, for Institute of International Container, Lessor.

## OPINION AND ORDER

HERMAN, District Judge.

### I. INTRODUCTION

Plaintiffs initiated this action to challenge the constitutionality of section 4703(a)(2) of the Pennsylvania Motor Vehicle Code, 75 Pa.C.S.A. § 4703(a)(2), *as amended*, Act of June 18, 1980, No. 68, 1980 Pennsylvania Legislative Service 191, which requires all motor carrier vehicles [1] operating on the highways of Pennsylvania to display "a currently valid certificate of inspection" issued by Pennsylvania or another state.[2] Thus, under the Act all such vehicles, whether in interstate or intrastate commerce and whether registered or not registered in Pennsylvania, must comply with the periodic inspection law of some state.

Plaintiff American Trucking Associations, Inc. ("ATA") located in Washington, D. C., is a federation composed of state trucking associations such as Plaintiffs Pennsylvania Motor Truck Association and Maryland Motor Truck Association. The remaining Plaintiffs—Coastal Tank Lines, Inc., CRST, Inc., Smith Transfer Corp., Ryder Truck Lines, Inc. and Preston Trucking Corp.—conduct trucking operations in interstate commerce by motor carrier vehicles that haul various commodities including chemicals, petroleum products, iron and steel products, perishable goods, and other general commodities.[3] Plaintiff-Intervenor Steamship Operators Intermodal Committee ("SOIC") is an unincorporated association whose members are common carriers by water and are engaged in the intermodal transportation of containerized cargo in the interstate and foreign commerce of the United States. Among SOIC's thirty-nine members are Sea-Land Service, United States Line, Farrell Lines, Maersk Line, Barber Lines, Orient Overseas Container Line, Zim Israel and Moore-McCormick Lines. The Defendant public officials, empowered to administer and enforce the statute, are the Secretary of the Department of Transportation, the Attorney General of the Commonwealth, and the Commissioner of the Pennsylvania State Police.

ATA and SOIC contend that the inspection provision at issue here imposes an enormous burden upon interstate commerce and that the alleged contribution to highway safety is purely illusory. Furthermore, ATA claims that the statute is vague, and thus, violates the due process clause of the Fourteenth Amendment because it allows administrative employees of the Commonwealth to use unfettered discretion in the interpretation and enforcement of the provision. In addition, SOIC contends that the statute imposes an arbitrary classification without a rational basis and that the state

---

1. The Act defines a "motor carrier vehicle" as "a truck, truck tractor or combination having a gross weight or registered gross weight in excess of 17,000 pounds." 75 Pa.C.S.A. § 102, *as amended.*

2. This subsection, in its entirety, provides:
   No motor carrier vehicle shall be operated on a highway unless it displays a currently valid certificate of inspection issued under this chapter or by another state.
   75 Pa.C.S.A. § 4703(a)(2), *as amended.*

3. Hereafter, unless specifically noted, all references to ATA shall apply to all Plaintiffs collectively.

has insufficient inspection stations to inspect all the vehicles which would have to be inspected under the law.

The complaint was filed on August 18, 1980 asking for injunctive relief and for a judgment declaring unconstitutional section 4703(a)(2) of the Pennsylvania Motor Vehicle Code, 75 Pa.C.S.A. § 4703(a)(2) *as amended*. At the same time Plaintiffs asked for a preliminary injunction and a temporary restraining order enjoining the enforcement of the section in question.

After hearing, the temporary restraining order was granted and on September 2, Steamship Operators Intermodal Committee was permitted to intervene.

Beginning on September 8 a four-day hearing was held on the request for a preliminary injunction, the trial on the merits having been advanced and consolidated with this hearing. The preliminary injunction was granted at the end of the hearing

on September 12, and November 3 was the date fixed for further hearing on the merits.

After five days of further hearings, the studying of briefs and oral argument and the full consideration of all of the facts and the law relative thereto, the court concludes and its judgment is that 75 Pa.C.S.A. § 4703(a)(2) imposes an unconstitutional burden on interstate commerce and accordingly a declaratory judgment and a permanent injunction against the enforcement of 75 Pa.C.S.A. § 4703(a)(2) will issue.

## II. FINDINGS OF FACT

Pursuant to 75 Pa.C.S.A. § 4703(a)(2), all motor carrier vehicles operating on Pennsylvania highways must display a currently valid certificate of inspection.[4] This certificate can be obtained through compliance with the inspection laws of Pennsylvania or another state.[5] Although considerable con-

---

**4.** ATA emphasized that the Act containing 75 Pa.C.S.A. § 4703(a)(2) was originally proposed as a bill to regulate studded snow tires. The provision in question here only appeared after being referred to a Senate/House Conference Committee. Furthermore, ATA maintains that the section was adopted without legislative discussion of its purpose or impact upon highway safety, and thus, should receive less deference as a safety provision. We disagree. A statute which promotes highway safety has no less impact on such safety whether or not it was discussed by the legislature prior to its enactment. As the Supreme Court said in Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959),

> We cannot assume that state legislative enactments were adopted arbitrarily or without good reason to further some legitimate policy of the State. What were the special reasons, motives or policies of the Ohio Legislature for adopting the questioned proviso we do not know with certainty, nor is it important that we should, *Southwestern Oil Co. v. Texas*, 217 U.S. 114, 126, [30 S.Ct. 496, 500, 54 L.Ed. 680] for a state legislature need not explicitly declare its purpose.

*Id.* at 528, 79 S.Ct. at 442. We think any other interpretation would be contrary to the principle that all state legislative enactments are presumed constitutional. *See, McDonald v. Board of Election*, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 524, 79 S.Ct. 962, 965, 3 L.Ed.2d 1003 (1959).

**5.** Under the authority conferred in 75 Pa.C.S.A. § 6103(a), *as amended*, Act of June 18, 1980, No. 67, 1980 Pa.Leg.Serv. 187, Defendant Larson, Secretary of the Department of Transportation caused to be published the following proposed regulation:

MEANING AND EFFECT OF VEHICLE CODE SECTION 4703(a)(2) AND (c)

Section 494.1. Purpose and Authority

(a) Purpose.—This chapter is promulgated to provide drivers and owners of vehicles, enforcement personnel and the courts with an analysis of the meaning and effect of Vehicle Code Section 4703(a)(2) and (c).

(b) Authority.—This chapter is promulgated under authority of Section 6103 of the Vehicle Code.

Section 494.2. Combinations.—Both the towing vehicle and the trailer in a combination having a gross weight or registered gross weight in excess of 17,000 lbs. shall comply with the provisions of Section 4703(a)(2) and (c) of the Vehicle Code and this chapter.

Section 494.3. Display of valid certificate of inspection from another state.—Vehicles, including elements of a combination, will be regarded as displaying a currently valid certificate of inspection issued by another state, IF:

(1) The vehicle was required to be inspected as a pre-requisite to registration and bears a currently valid registration plate, or

(2) The driver exhibits on request of any police officer or a Department employee engaged in weighing vehicles a currently valid document issued in accordance with the law

troversy existed concerning which states have inspection programs that would fulfill the requirements of the statute, the evidence demonstrated that 25 states and the District of Columbia have some type of periodic inspection program.[6] Six of these states, however, exempt interstate motor carrier vehicles subject to regulation by the Federal Bureau of Motor Carrier Safety ("BMCS") from the requirements of that state's inspection law.[7] Several other states have atypical inspection procedures, such as New Jersey, which requires inspection for registration,[8] or Maryland, which requires inspection only in the event of retitling with an undated certificate of inspection given upon request.[9] *None* of these states, however, require inspection of vehicles registered in another state. Regardless of these inspection programs as they now exist, approximately 231,000 tractors and 700,000 trailers, including chassis owned by

members of SOIC, are currently not required to be inspected by any state, and thus, if operated in Pennsylvania would be subject to the Pennsylvania inspection scheme.[10]

The purported purpose of this inspection provision is to improve highway safety in Pennsylvania.[11] The Commonwealth's inspection program for motor carrier vehicles includes a periodic verification of the vehicle's registration and an inspection of the vehicle's brakes, tires, wheels, glazing, mirrors, operating controls, lighting, body, sheet metal, and the suspension, steering, fuel, exhaust and electrical systems.[12] In selective and random highway checks conducted by the Federal Bureau of Motor Carrier Safety and the Pennsylvania Department of Transportation of commercial interstate vehicles, between 40 and 60 percent of such vehicles were found hazardous and placed out of service.[13] Yet, during

or regulation of another state evidencing that the vehicle has been inspected.
Section 494.4. Vehicles reentering this Commonwealth.—Vehicles, including elements of a combination, which have been outside this Commonwealth continuously for 30 days or more and which, at the time of reentering this Commonwealth, do not bear a currently valid certificate of inspection shall be inspected within five days of reentering this Commonwealth. The driver of the vehicle shall be required, at the request of a police officer or Department employee engaged in weighing vehicles, to provide adequate proof that the vehicle has been outside this Commonwealth continuously for at least 30 days.

6. In addition to Pennsylvania, the following states have inspection programs that require inspection of motor carrier vehicles: Arkansas, Colorado, Delaware, Florida, Georgia, Hawaii, Illinois, Louisiana, Maine, Massachusetts, Mississippi, Missouri, Nebraska, New Hampshire, New York, North Carolina, Oklahoma, Rhode Island, South Carolina, Texas, Utah, Vermont, Virginia, and West Virginia. Defendants' Ex. 12.

7. This exemption applies in Florida, Illinois, Mississippi, Missouri, Nebraska and South Carolina. ATA Ex. 4, Trial Transcript ("Tr.") 25–26. Section 60–1701 of the Nebraska inspection statute has been declared unconstitutional. *Nebraska v. Edmunds*, Doc. 108 No. 163 (Douglas County Dist. Ct., Nebraska, filed Sept. 22, 1980). ATA Ex. 28, Tr. 516.

8. Since New Jersey only imposes marginal requirements on inspectors, it is questionable

whether such inspections would meet Pennsylvania requirements. Tr. 767–74.

9. Tr. 438. This same requirement exists in Iowa. Tr. 777–78.

10. ATA Ex. 4.

11. Pennsylvania statistics indicated that during the last 6 years fatal accidents increased 2.2% and injury accidents not resulting in a fatality have increased 9.3%. During the same period, the number of tractor-trailer combinations involved in fatal crashes had increased 60.4% and in injury accidents had increased 30.5%. Defendants' Ex. 1.

12. ATA Ex. 19.

13. BMCS with the assistance of the Pennsylvania State Police conducted three inspections of interstate commercial vehicles on Interstate–80 near Berwick, Pennsylvania. During the first inspection from August 7 to 11, 1978, 676 vehicles were inspected and 352 or 52% were placed out of service. Defendants' Ex. 3. From September 18 to 22, 1978, BMCS inspected 273 vehicles and placed 155 or 57% out of service. Defendants' Ex. 2. In the third inspection from May 21 to 23, 1979, 291 vehicles were inspected and 169 or 58% placed out of service. Defendants' Ex. 4. In each of these inspections, BMCS used a prescreening selection procedure, which was described in the BMCS report as follows:

The selective method involves a visible and audible prescreening by the Federal inspector

1979, only 8.80 percent of the motor carrier vehicles involved in accidents had a vehicle failure cited as a *contributing* cause.[14] Thus, no relationship is shown to exist between mechanical defects in vehicles and accidents caused by such vehicles.[15] Similar evidence demonstrates that tractor-trailer combinations from non-inspecting states did not have a statistically disproportionate percentage of accidents than tractor-trailer combinations registered in inspection states. Although 45.48 percent of all tractors were registered in inspection states, they accounted for 43.84 percent of the fatal accidents in 1979 involving tractor-trailers.

Likewise, while 40.66 percent of all tractors were registered in non-inspection states, 37.94 percent of the fatal accidents in 1979 involved such tractor-trailers. Only tractors from states with an interstate inspection exception exceeded their proportion of the tractor population with 13.86 percent of tractor registrations but 18.22 percent of all fatal accidents.[16] This evidence also suggests that no correlation exists between mandatory periodical inspections and highway safety.[17]

Indeed, semiannual or annual inspections of high mileage vehicles such as motor carrier vehicles are insufficient to discover and

---

to determine if there are obvious signs of defects. If during this cursory examination a deficiency is noted, a thorough inspection of the vehicle and driver documentation is performed.

The selective prescreening inspection procedure is intended to identify as many defective vehicles as possible during the inspection period. *The prescreening inspection procedure is not intended to produce statistically valid measurements about the number or percent of defective vehicles on the highway.* Defendants' Ex. 4 (emphasis added).

BMCS conducted similar inspections at various service plazas on the Pennsylvania turnpike between October 16 and 18, 1978. Again, the prescreening procedure was employed by inspectors. 168 vehicles were inspected and 95 or 57% were placed out of service. Defendants' Ex. 5. Yet, in both the Berwick inspections and the turnpike inspections, there was no distinction made between vehicles registered in inspection states and those registered in non-inspection states. Thus, such statistics do not provide evidence that mandatory periodical inspections increase highway safety.

The Commonwealth, however, conducted two subsequent surveys in an effort to show a relationship between a low incidence of mechanical defects and periodic inspection. But these surveys suffered from many significant procedural problems. The inspectors lacked training; there were many inaccurate and incomplete inspection forms; and many forms failed to indicate whether or not the vehicle inspected came from an inspection state or a non-inspection state. All of these matters tended to reduce the statistical validity of the results and we find that the numbers that the Commonwealth produced from these inspections are meaningless.

**14.** Defendants' Ex. 1.

**15.** This finding is supported by a recent Commonwealth report which concluded "[w]hile this indicates that the vehicle inspection program is successful in identifying vehicle defects, the present study has shown that the association between vehicle defects and motor vehicle accidents is, at best, tenuous." Commonwealth of Pennsylvania, Office of Budget and Administration, Report on Motor Vehicle Inspection, p. 30 (January 1981), SOIC Ex. 13. At oral argument held on February 26, 1981, SOIC moved to reopen the trial for the sole purpose of introducing this report into evidence. Although we denied this request, we have quoted from the report, a public document, in several footnotes. Our use of the report, however, is only to corroborate the evidence that was previously presented in this action.

**16.** Tr. 950–52, ATA Ex. 35. Tractor registrations based on 1977 data.

**17.** Again, we compare our findings to the conclusion reached in the Commonwealth's recent study.

The major conclusion of this study is that semiannual motor vehicle inspection is not a cost-effective means of controlling motor vehicle accident rates. *In fact, this study confirms the findings of several others which have concluded that accident rates among states with annual and semiannual inspections are essentially the same as those in states with no vehicle inspection programs after basic socioeconomic, demographic, environmental and highway differences are taken into account.* The study further concludes that since the frequency of vehicle inspection has no measurable influence on motor vehicle accident rates, a reduction in the frequency of vehicle inspection could be accomplished without an appreciable decline in traffic safety.

Report on Motor Vehicle Inspection, *supra* note 15 at 35 (emphasis added.).

correct mechanical defects. Trucking companies would have to continue in-house inspections.[18] Such inspections might consist of the mandatory systematic inspection, repair and maintenance of all motor vehicles subject to BMCS control. Under BMCS regulations, every motor carrier must require its drivers to prepare a report at the completion of each day's work with the vehicle covering at least the following parts and accessories: service brakes, including trailer brake connections; parking (hand) brakes; steering mechanism; lighting devices and reflectors; tires; horn; windshield wipers; rear vision mirrors; coupling devices; wheels and rims; and emergency equipment. 49 C.F.R. § 396.11. Any defects or deficiencies affecting the safety of operation of the motor vehicle or resulting in its mechanical breakdown must be reported by the driver. Before the motor carrier vehicle may be operated again, any such defects or deficiencies must be repaired and a certification to that effect submitted. *Id.* § 396.11(c). Before a driver takes out a motor carrier vehicle, he must under § 396.13 visually inspect it, satisfy himself that it is in safe operating condition, review the most recent inspection report carried on the vehicle, and sign the report only if he finds a certification that any safety-related defects or deficiencies have been repaired.[19] Although BMCS imposes no mandatory inspection interval, motor carriers typically inspect their vehicles from 4 to 12 times per year depending upon

vehicle usage, region of the country, and other factors that differ for each motor carrier vehicle.[20]

The reason that semiannual inspections are inadequate to improve highway safety is because of the processes of deterioration and failure which affect the structural and mechanical components of all motor carrier vehicles. The deterioration and failure of these vehicles occurs slowly and progressively, without predictability of when a mechanical failure might occur.[21] An inspection, however, will only detect the condition of the vehicle at the time the inspection is made.[22] Thus, such inspections do not lead to a reduction in accidents caused by mechanical failures.[23]

ATA and SOIC demonstrated that the Pennsylvania law places substantial burdens on interstate commerce. Section 4703(a)(2) requires the trucking and containerized shipping industries to make a choice among various alternatives, including (1) inspection of their vehicles in Pennsylvania, (2) inspection of their vehicles in another inspection state, or (3) diverting motor carrier vehicles around Pennsylvania. Any of these methods of complying with the law imposes substantial costs and delays upon interstate and foreign commerce.

If these companies choose either the first or second method, they will incur considerable costs and delays associated with the inspections. The average tractor inspection

**18.** Tr. 868.

**19.** Tr. 54–55, 65–66.

**20.** Tr. 56–57, 86–87, 114–16, 125–27. Defendants, however, suggest those BMCS standards are *ignored by owners of motor carrier vehicles* because of economic considerations in maintaining such vehicles and foregoing inspections to keep such vehicles on the highways. This court fails to discern any difference between the BMCS procedures and fleet inspection permitted under the Pennsylvania inspection law. Both rely on the honesty of the owner in performing inspections. But under the fleet inspection the owner must pay the Commonwealth for his "certificate of inspection."

**21.** Tr. 622–23.

**22.** Tr. 647.

**23.** As indicated in the Commonwealth report,

[A]lthough existing brake system or tire outages may be detected by the inspection process, most brake or tire failures probably cannot be prevented because they also have the tendency to occur without warning.

From this discussion it appears that while periodic motor vehicle inspection may be relatively successful in detecting certain component outages or failures, *it is unlikely that PMVI [periodic motor vehicle inspection] actually can prevent those outages or failures, or substantially reduce the number of frequently occurring component defects existing in vehicles in use on public highways.*

Report on Motor Vehicle Inspections, *supra* note 15 at 31 (emphasis added).

takes at least ninety minutes and the average trailer or semitrailer inspection about thirty minutes.[24] The cost for each inspection of a semitrailer at an official inspection station ranges from $12.00 to $18.00.[25] There also would be further costs connected with drivers' salaries and additional fuel consumption while taking motor carrier vehicles to an inspection station, waiting during the inspection, and returning the vehicle to the owners' place of business or back to its intended course of travel.[26]

Although many vehicles would probably be inspected outside of Pennsylvania, it is clear that owners of such vehicles cannot identify every vehicle that will travel through Pennsylvania. This results from several factors. First, tractors and trailers are not "wed" together. Instead, tractors and trailers are randomly and frequently interchanged and are rarely combined for more than one or two consecutive movements at a time.[27] Second, many commercial and industrial businesses have begun to use trucks as "rolling warehouses" or "inventory in motion."[28] In most instances, Coastal Tank Lines will receive its order to transport goods only a day in advance in which time it must pick up, transport, and deliver the load.[29] Similarly, automobile assembly plants, such as the Volkswagen plant in New Stanton, Pennsylvania, maintain a very limited supply of parts on hand. This reduction in inventory requires truckers to deliver parts precisely when they are needed. A failure to deliver these parts on time could lead to shutdowns of the production line at a cost of $6,000 per minute.[30] Finally, the growth of the containerized cargo industry has made it difficult to determine which vehicles will move through particular states.[31] Thus, companies en-

24. Tr. 33.

25. Tr. 41.

26. For example, Coastal Tank Lines ("Coastal") estimated its extra costs on the basis of 772 trailers and 333 tractors without certificates of inspection. Coastal has determined that compliance with the inspection requirement could best be accomplished by detouring these vehicles to its fleet inspection station in Coraopolis, Pennsylvania. The diversion from I–80 to Coraopolis and back is 150 miles. At about 5 miles per gallon, this detour for each motor carrier vehicle would consume about 30 gallons of diesel fuel. Coastal determined that the detour to Coraopolis would require 3 hours, plus 2½ hours for a complete inspection of tractor and trailer, and an additional hour delay because of the volume of equipment. Thus, the estimated annual cost to Coastal would be $43,-418 in mechanics' wages, $62,857 in total drivers' wages, and $46,000 in additional fuel costs. Tr. 86–94.

27. Tr. 96.

28. Tr. 129, 279.

29. Tr. 91.

30. Tr. 228–32. The Department of Defense has also adopted this "inventory in motion" concept to supply military hardware and subsistence items to United States bases in Europe. Much of this cargo originates at the New Cumberland Army Depot and the Defense Depot in Mechanicsburg, Pennsylvania. This method of supplying European bases would be seriously jeopardized by any disruption of service. Tr. 274–84.

31. See the following testimony of William R. Delaney, General Manager of Intermodal Services for Maersk Line.

BY MR. BARKAN (Counsel for SOIC):

Q. Is it possible in the loading and unloading process ... [t]o match up chassis which are certified under the new Pennsylvania statute—or may be certified under the new Pennsylvania statute—with containers that will find their way into Pennsylvania?

A. No, sir.

Q. Or through Pennsylvania?

A. No, sir, it can't be done.

BY THE COURT:

Q. In other words, to operate under this new law, as far as you are concerned, all 8,000 of your chassis would have to be inspected in Pennsylvania or in another state that Pennsylvania recognizes. Is that right?

A. Yes, sir, in order to comply with this law, yes, sir.

BY MR. BARKAN:

Q. When a container is shipped from overseas and a bill of lading is issued, it goes to a port city in the United States, is that correct, as defined by you earlier?

A. That's one mode, yes, sir.

Q. Is it possible in all instances to tell whether or not a particular container will be going to Pennsylvania?

A. No, sir, not at all.

Q. Can you explain why not?

A. Certain of the traffic moves on odd bills of lading where we don't even know the ad-

gaged in trucking and shipping cannot predetermine which vehicles must be inspected.

Furthermore, if drivers take such uninspected vehicles through Pennsylvania, it will often be late at night when interstate motor carriers travel. At these times, many inspection stations will not be open.[32] Even if a driver can find an inspection station, perishable items may be damaged because of the delay required by inspection.[33]

Instead of getting an inspection, the trucking industry could choose to circumvent Pennsylvania. The costs of this choice are enormous in terms of additional time and fuel consumption. CRST, for example, estimated its additional costs for discontinuing usage of three routes through Pennsylvania that it currently utilizes: Interstate 80, Interstate 70, and the Pennsylvania Turnpike. The additional difference in miles from Akron, Ohio to New York City not using I–80 is 210 miles, the difference from Akron to Philadelphia and New Jersey not using the Pennsylvania Turnpike is 160 miles, and the difference from Akron to Maryland not using I–70 is 76 miles. The additional fuel required per load from Akron to New York City would be 41.2 gallons; to Philadelphia, 31.4 gallons; to Maryland, 14.9 gallons. The trip from Akron to New York City would take 4.6 hours longer at 45 mph; to Philadelphia, 3.6 hours longer; to Maryland, 1.7 hours longer. Increased costs per load on refrigerated trailers to New York City would be $179.55; to Philadelphia, $136.80; to Maryland, $64.98.

On flatbed operations, they are $170.52, $129.92, and $61.72, respectively.[34]

## III. DISCUSSION

### 1. The Commerce Clause

■ Although the Commerce Clause is recognized as both a source of congressional power [35] and a limitation on states' authority even when Congress has not acted, the extent to which the Clause prevents states from erecting barriers to interstate commerce is the subject of considerable controversy, particularly in the area of highway safety legislation. It is true that the Commerce Clause does not prevent states from enacting nondiscriminatory legislation designed to serve legitimate state interests even though it affects the flow of interstate commerce. Nevertheless, "in areas where activities of legitimate local concern overlap with the national interests expressed by the Commerce Clause—where local and national powers are concurrent—the Court in the absence of congressional guidance is called upon to make 'delicate adjustment of the conflicting state and federal claims,' *H. P. Hood & Sons, Inc. v. Du Mond,* [336 U.S. 525], at 553, 69 S.Ct. 657, 679, 93 L.Ed. 865 (Black, J., dissenting), thereby attempting 'the necessary accommodation between local needs and the overriding requirement of freedom for the national commerce.' *Freeman v. Hewit,* [329 U.S. 249], at 253, 67 S.Ct. 274, 277, 91 L.Ed. 265." *A & P Tea Co. v. Cottrell,* 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976). The current

---

*dress of the ultimate consignee that is the beneficial owner of the goods. Some goods are bought and sold in transit and is [sic] subject to diversion rules after the vessel is already en route.*

And still more traffic is tendered to the truckman as a final delivery at the port city. But he may then, on his own bill of lading, transport that container to any place within the United States. Or pretty much anywhere within North America. He has an interchange agreement with Maersk Line or with the ocean carrier, he has an interchange receipt and safety *inspection report. And he is paying per diem for that unit.*

So within the bounds of good business judgment, he can drive that container any place he wants to.

And the account may have wanted delivery in Philadelphia but subsequently we sold it even without touching it to somebody in Ohio. Or vice versa, for that matter.
Tr. 174–76. *See also* Tr. 236.

**32.** Tr. 514–15.

**33.** Tr. 130.

**34.** Tr. 109–13.

**35.** "The Congress shall have Power ... To regulate Commerce ... among the several States." U.S.Const. Art. I, § 8, cl. 3.

controversy centers upon the degree to which courts should make this "delicate adjustment," which has also been referred to as a "sensitive consideration." The nature of this problem is apparent in two recent decisions by the Supreme Court, *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) and *Kassel v. Consolidated Freightways Corp.*, —— U.S. ——, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981), both of which questioned the constitutionality of state limitations on truck lengths.

*Raymond* involved a challenge to Wisconsin's administrative regulations governing the length and configuration of trucks that may be operated on Wisconsin highways. The regulations limited the overall length of a tractor pulling a single trailer to 55 feet. All single trailer units ("singles") longer than 55 feet and all tractors pulling more than one trailer ("doubles") were prohibited from operating on the highway without a permit. These regulations, however, had numerous exceptions which permitted the use of many vehicles over 55 feet, in fact to lengths up to 100 feet. While the trucking companies introduced much evidence indicating that 65–foot doubles were as safe as 55–foot singles, Wisconsin made no effort to contradict this evidence of comparative safety.

Although the Supreme Court rendered a unanimous decision, the Justices were evenly divided[36] with respect to the approach courts should use in Commerce Clause cases. In the Court's opinion, written by Justice Powell, the Court maintained that the inquiry regarding permissible and impermissible impacts on interstate commerce "necessarily involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." 434 U.S. at 441, 98 S.Ct. at 794. This sensitive consideration required a weighing approach similar to the one advanced in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) ("Where the statute reg-

ulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."). While state regulations promoting highway safety have a "strong presumption of validity," *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 524, 79 S.Ct. 962, 965, 3 L.Ed.2d 1003 (1959), Wisconsin had "virtually defaulted in its defense of the regulations as a safety measure." *Raymond*, supra, 434 U.S. at 444, 98 S.Ct. at 795. Therefore, the Court was "persuaded that the challenged regulations violate the Commerce Clause because they place a substantial burden on interstate commerce and they cannot be said to make more than the most speculative contribution to highway safety." *Id.* at 447, 98 S.Ct. at 797.

In a concurring opinion, Justice Blackmun, however, emphasized the narrow scope of the *Raymond* decision. Justice Blackmun specifically rejected any attempt to balance or weigh legitimate safety justifications against the burden on interstate commerce. Rather, he maintained that the Court should restrict its analysis to whether the purported safety interest actually existed.

> In other words, if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce .... Here, the Court does not engage in a balance of policies; it does not make a legislative choice. Instead, after searching the factual record developed by the parties, it concludes that the safety interests have not been shown to exist as a matter of law.

434 U.S. at 449–50, 98 S.Ct. at 798 (Blackmun, J., concurring).

The dust had barely settled in *Raymond*, when Consolidated Freightways Corporation of Delaware initiated an action to have Iowa's 60–foot limitation on doubles de-

---

**36.** Justice Stevens took no part in the consideration or decision of that case.

clared unconstitutional as it applied to certain interstate highways, access routes to Consolidated's terminals, and reasonable access to facilities for food, fuel, repairs or rest. Unlike the defendants in *Raymond*, Iowa attempted to seriously support the safety justifications of the 60–foot maximum on doubles. The district court, however, found:

> Twins and semis have different characteristics. Twins are more maneuverable, are less sensitive to wind, and create less splash and spray. However, they are more likely than semis to jackknife or upset. They can be backed only for a short distance. The negative characteristics are not such that they render the twin less safe than semis overall. Semis are more stable but are more likely to "rear end" another vehicle.

> The added length of the twin is not a substantial factor on four lane divided highways. The state by legalizing the 65 foot automobile carrier has weakened its claim that the extra length creates a safety hazard. It has practically destroyed its argument that double trailers are an additional safety hazard by legalizing the 60 foot twin. The uncontradicted evidence established that the extra five feet in length makes the 65 foot twin more stable than the 60 foot twin.

475 F.Supp. 544, 549 (S.D.Iowa 1979). Thus, the court concluded that "[t]he evidence convincingly, if not overwhelmingly, establishes that the 65 foot twin is as safe as, if not safer than, the 60 foot twin and

the 55 foot semi." *Id.* at 548. Since the legislation had only a "slight or problematical" safety benefit, which did not outweigh the burdens on interstate commerce, the court held the statute unconstitutional. The Court of Appeals for the Eighth Circuit affirmed. 612 F.2d 1064 (8th Cir. 1979).

When *Consolidated Freightways* reached the Supreme Court, the Justices were again divided on the issue of which analytical approach to apply to this question. By this time, the Justices, however, had split into three groups, none of which represented a majority of the court.[37] Justice Powell, announcing the judgment of the Court, delivered a plurality opinion advocating the weighing approach.[38] Although the plurality recognized the strong presumption of validity given to safety statutes, they would not stop their analysis merely because the state asserted a public safety purpose. As Justice Powell explained:

> But the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause. In the Court's recent unanimous decision in Raymond, we declined to "accept the State's contention that the inquiry under the Commerce Clause is ended without a weighing of the asserted safety purpose against the degree of in-

---

**37.** For this reason, Justice Rehnquist suggested, perhaps correctly, that *Consolidated Freightways* has little legal significance.

> The true problem with today's decision is that it gives no guidance whatsoever to these States as to whether their laws are valid or how to defend them. For that matter, the decision gives no guidance to Consolidated or other trucking firms either. Perhaps, after all is said and done, the Court today neither says nor does very much at all. We know only that Iowa's law is invalid and that the jurisprudence of the "negative side" of the Commerce Clause remains hopelessly confused.

—— U.S. at ——, 101 S.Ct. at 1334 (Rehnquist, J., dissenting). *See also* Note, Plurality Decisions and Judicial Decisionmaking, 94 Harv.L.

Rev. 1127, 1128 (1981), in which the author stated:

> The Supreme Court has a role beyond that of resolving individual disputes; it serves as a guide for private parties, legislatures, lower courts, and its own future decisions. In order to perform this function adequately the Court must provide definitive statements of the law. More than a mere agreement on the result is needed; without a majority rationale for the result, the Supreme Court abdicates its responsibility to the institutions and parties depending on it for direction. Each plurality decision thus represents a failure to fulfill the Court's obligations.

**38.** Justice Powell was joined by Justice White, Justice Blackmun, and Justice Stevens.

terference with interstate commerce." This "weighing" by a court requires—and indeed the constitutionality of the state regulation depends on—"a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce."

—— U.S. at ——, 101 S.Ct. at 1316 (citations and footnote omitted). Employing these principles, the plurality found that the record supported the district court's determination that 65 foot twins were as safe as 60 foot twins or 55 foot semis. Thus, while the 60–foot limitation on doubles is a substantial burden on interstate commerce, Iowa's safety interest was merely illusory.

Although Justice Brennan concurred in the judgment of the Court,[39] he examined the case quite differently. According to Justice Brennan,

> [A]nalysis of Commerce Clause challenges to state regulations must take into account three principles: (1) The courts are not empowered to second-guess the empirical judgments of lawmakers concerning the utility of legislation. (2) The burdens imposed on commerce must be balanced against the local benefits actually sought to be achieved by the State's lawmakers, and not against those suggested after the fact by counsel. (3) Protectionist legislation is unconstitutional under the Commerce Clause, even if the burdens and benefits are related to safety rather than economics.

Id. at ——, 101 S.Ct. at 1320. Thus, Justice Brennan would have courts "balance the burden imposed on commerce against the local benefits sought to be achieved by the State's lawmakers." Id. (emphasis original). Because Justice Brennan concluded that the goal of the Iowa legislature was to discourage interstate truck traffic on Iowa's highways, the statute is unconstitutional as protectionist legislation. Nevertheless, Justice Brennan would hold that courts may rely upon post hoc justifications of counsel when "there is

no evidence bearing on the actual purpose for a legislative classification . . . ." Id. at —— n.3, 101 S.Ct. at 1322 n.3, but even when such post hoc justifications may be considered, Justice Brennan would limit the court's role. As Justice Brennan noted:

> Moreover, I would emphasize that in the field of safety—and perhaps in other fields where the decisions of State lawmakers are deserving of a heightened degree of deference—the role of the courts is not to balance asserted burdens against intended benefits as it is in other fields. In the field of safety, once the court has established that the intended safety benefit is not illusory, insubstantial, or nonexistent, it must defer to the State's lawmakers on the appropriate balance to be struck against other interests. I therefore disagree with my Brother Powell when he asserts that the degree of interference with interstate commerce may in the first instance be "weighed" against the State's safety interests . . . .

Id. at —— n.1, 101 S.Ct. at 1321 n.1 (citations omitted). Thus, at least in this respect, Justice Brennan would follow the approach advanced by Justice Blackmun's concurring opinion in Raymond.

In a dissenting opinion, Justice Rehnquist rejected both the "weighing test" adopted by the plurality and Justice Brennan's consideration of the actual purposes identified by the legislature.[40] While acknowledging that courts must make a " 'sensitive consideration' of the safety purpose in relation to the burden on commerce," Id. at ——, 101 S.Ct. at 1326, Justice Rehnquist began his analysis with the view that "Iowa must simply show a relation between vehicle length limits and safety, and that the benefits from its length limit are not illusory." Id. at ——, n.8, 101 S.Ct. at 1329, n.8. Thus, he would not compare the safety characteristics of a 65–foot double with those of a 60–foot double or a 55–foot single. Instead, it is sufficient for Iowa to produce evidence showing that longer vehi-

---

**39.** Justice Marshall joined Brennan's opinion concurring in the judgment of the Court.

**40.** Chief Justice Burger and Justice Stewart joined in this dissent.

cles take greater time to pass, are more likely to clog intersections, and pose greater problems at the scene of an accident. Having presented evidence showing that truck length affects highway safety, Justice Rehnquist would allow the state to make its own choice concerning the appropriate truck length which the state will adopt. "Since the adoption of one weight or width regulation, rather than another, is a legislative and not a judicial choice, its constitutionality is not to be determined by weighing in the judicial scales the merits of the legislative choice and rejecting it if the weight of evidence presented in court appears to favor a different standard." *Id.* at ——, 101 S.Ct. at 1329, *quoting South Carolina State Highway Department v. Barnwell Brothers, Inc.,* 303 U.S. 177, 191, 58 S.Ct. 510, 517, 82 L.Ed. 734 (1938). At this point, Justice Rehnquist advocated making a sensitive consideration without weighing the conflicting interests "to determine if the asserted safety justification, although rational, is merely a pretext for discrimination against interstate commerce." When safety benefits are trivial and the burden on commerce is substantial, courts should conclude that the safety justifications are a pretext. —— U.S. at ——, 101 S.Ct. at 1327.

Although this court is persuaded that the weighing test employed by the plurality in *Consolidated Freightways* is the proper analysis by which courts should determine Commerce Clause issues, we hesitate to follow this approach because of the inconclusive nature of the various opinions. As Justice Rehnquist pointed out, "[i]t should not escape notice that a majority of the Court goes on record today as agreeing that courts in Commerce Clause cases do not sit to weigh safety benefits against burdens on commerce when the safety benefits are not illusory." *Id.* at ——, n.4, 101 S.Ct. at 1327, n.4. Instead, rather than become embroiled in this controversy, we shall follow the narrow view expressed by Justice Rehnquist. Thus, this court will inquire whether the Pennsylvania legisla-

ture acted rationally in regulating vehicle inspections and whether the safety benefits are more than slight or problematical. This decision, however, does not alter the ultimate outcome in this action because we are convinced that this periodic inspection statute, which substantially burdens interstate commerce, has, at best, insubstantial, slight, and problematical benefits.

### 2. The State Safety Interest

■ As Justice Rehnquist has observed, "[t]he whole purpose of safety regulation of vehicles is to *protect* the State from unsafe vehicles." *Id.* at ——, 101 S.Ct. at 1334 (emphasis original). Indeed, we have no doubt that Pennsylvania may constitutionally prevent unsafe vehicles from traversing upon its highways. For example, pursuant to 75 Pa.C.S.A. § 4704(c),

> In the event a vehicle, in the reasonable judgment of the officer, is in such condition that further operation would be hazardous, the officer may require that the vehicle not be operated under its own power . . . .

Pennsylvania, however, seeks to equate "unsafe vehicles" to those motor carrier vehicles that do not bear a valid certificate of inspection. While Pennsylvania attempted to demonstrate by means of statistical evidence and expert testimony that periodic inspection promotes highway safety, we conclude that the relationship between such inspection and highway safety is dubious.

The structural and mechanical components of all motor carrier vehicles are subject to the processes of deterioration and failure. An examination of the vehicle *may* detect such deterioration. Thus, at the time of the inspection, the owner may correct defects in the vehicle. Yet, the evidence indicates that such inspections do not guarantee the safety of a vehicle in the future. Mechanical failures can and do occur without warning and despite inspection of the vehicle.[41] Furthermore, under Pennsylvania's inspection requirements, owners of motor carrier vehicles could comply with

---

**41.** *See* n. 23 *supra.*

the law by inspection in a state which only requires an annual inspection. Thus, these vehicles, many of which are driven over 100,000 miles a year, would only require one inspection per year. Even Pennsylvania's expert witness stated that on such high mileage vehicles, an annual inspection was inadequate.[42]

■ In addition, the statistical evidence failed to demonstrate that inspected vehicles were safer than non-inspected vehicles. As we previously indicated, the BMCS studies did not differentiate between motor carrier vehicles with and without certificates of inspection. In addition, those studies were clearly not intended for use as statistically valid measurements. The surveys conducted by Pennsylvania in response to this litigation fail to disclose any highway safety benefits of mandatory periodic inspection. First, the procedural aspects of the study are suspect. Second, the surveys only identify mechanical defects without demonstrating a link between defects and accidents.[43] Furthermore, the statistical evidence relating to accidents failed to indicate that inspected motor carrier vehicles were safer than uninspected motor carrier vehicles.[44] This finding was supported by Pennsylvania's own study concerning the effectiveness of periodic inspections.[45] From this review of the record, we conclude that the mandatory periodic inspection of all motor carrier vehicles required by 75 Pa.C.S.A. § 4703(a)(2) is not a rational safety measure and that the alleged safety burdens are illusory and insubstantial.

### 3. Burdens on Interstate Commerce

■ In making our sensitive consideration of the purported safety benefits in relation to the burden on interstate commerce, it is clear that these insubstantial benefits are trivial while the burden on such commerce is substantial. Indeed, by requiring motor carrier vehicles to exit interstate highways to find an inspection station, the statute may actually increase the hazards of highway travel. See Consolidated Freightways, —— U.S. at ——, 101 S.Ct. at 1323–24 (Brennan, J., concurring). Furthermore, trucking and shipping companies will incur considerable expense associated with inspections, drivers' wages, and extra fuel consumption. "Cost taken into consideration with other factors might be rele-

---

42. Testimony of Dr. James J. Schuster, Professor of Civil Engineering, Villanova University:

Q. I also understand from your testimony that one inspection is good, two inspections would be better and more inspections would be better still?
A. Yes, sir, more inspections do enhance safety.
Q. If the carriers inspected their tractors every 25,000 miles, that would be better than having them inspected once a year, would it not?
A. Depending on how many miles travelled per year.
Q. The testimony has been in this case that most interstate trucks travel 105,000 miles a year.
A. Yes.
Q. And it would be far better and far safer for tractors to be inspected every 25,000 miles or every two months than it would be to have them inspected once a year?
A. Yes. But from an engineering viewpoint, you have the idea of feasibility. Daily rigorous inspections are good, but you have to reach the point of what is feasible, what is reasonable. And I think twice a year is reasonable.
Q. Once a year is more reasonable than twice a year?

A. No, I said twice a year is reasonable to me.
Q. How about once a year?
A. Not as reasonable. I would prefer two, myself.
Q. Is it adequate?
A. Once a year?
Q. Yes.
A. In certain circumstances, yes.
Q. I mean for a vehicle going 105,000 miles?
A. *That alone, just that inspection, is not adequate, no.*
Q. You recognize that this law would permit tractors who get one inspection a year to travel the highways of Pennsylvania without anything else?
A. I will assume that fleets and individuals wouldn't simply say: Well, this inspection takes care of everything. There is a certain responsibility, the driver has, the mechanics have for in-house inspections that should be done in addition to this.
Tr. 867–68 (emphasis added).

43. See n. 13 supra.

44. See pp. 1330–1331 supra.

45. See n.17 supra.

vant in some cases to the issue of burden on commerce." *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. at 526, 79 S.Ct. at 966. *See also Raymond*, 434 U.S. at 445, 98 S.Ct. at 796 ("The regulations substantially increase the cost of [interstate] movement, a fact which is not ... entirely irrelevant."). Thus, as in *Raymond*, ATA and SOIC "produced uncontradicted evidence showing that their operations [would be] disrupted, their costs [would be] raised, and their service ... slowed ..." if the inspection statute is permitted to go into effect. 434 U.S. at 438, 98 S.Ct. at 792. Therefore, we conclude that the strong presumption of validity accorded to this legislation has been overcome and that the statute violates the Commerce Clause.[46]

## IV. CONCLUSION

On the basis of the foregoing, which constitutes the court's findings of fact and conclusions of law, see Rule 52(a) of the Federal Rules of Civil Procedure, we conclude that 75 Pa.C.S.A. § 4703(a)(2) has only illusory, slight, or problematical safety benefits while it imposes substantial burdens on interstate commerce. Therefore, we shall grant declaratory and injunctive relief in favor of the Plaintiffs.

---

**46.** Several alternate arguments have been raised in this action. First, ATA contends that the statute violates the due process clause of the Fourteenth Amendment on grounds of vagueness. Second, SOIC maintains that including chassis while excluding automobiles is an arbitrary classification because of their comparative safety. Finally, SOIC claims that the statute is fundamentally unfair in violation of the due process clause because the number of inspection stations in Pennsylvania is inadequate to inspect all the vehicles required to be inspected. While these contentions are generally without merit, we do not address them since we have already determined that the statute is unconstitutional.