AMERICAN TRUCKING ASSOCIA-
TIONS, INC., Pennsylvania Motor
Truck Association, Maryland Motor
Truck Association, Coastal Lines, Inc.,
CRST, Inc., Smith Transfer Corp., Ryder
Truck Lines, Inc., Preston Trucking
Corp., and Intervenor Steamship Opera-
tors Intermodal Committee, Appellees,

v.

Thomas D. LARSON, Secretary of the De-
partment of Transportation of the Com-
monwealth of Pennsylvania; Harvey
Bartle, III, Attorney General of the
Commonwealth of Pennsylvania; Daniel
F. Dunn, Commissioner of the Pennsyl-
vania State Police, Appellants.

No. 81–2312.

United States Court of Appeals,
Third Circuit.

Argued Feb. 16, 1982.

Decided July 20, 1982.

Michael R. Deckman (argued), Deputy Chief Counsel, P. Dept. of Transp., Harrisburg, Pa., for appellants; Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel.

Arthur R. Littleton (argued), Thomas A. Schneider, Philadelphia, Pa., for appellees, American Trucking Associations, Inc., Pennsylvania Motor Truck Ass'n, Maryland Motor Truck Ass'n, Coastal Lines, Inc., CRST, Inc., Smith Transfer Corp., Ryder Truck Lines, Inc., and Preston Trucking Corp.; Brauner, Baron, Rosenzweig, Kligler, Sparber & Bauman, New York City, of counsel.

Seymour H. Kligler (argued), Mel P. Barkan, New York City, for appellee intervenor Steamship Operators Intermodal Committee.

Edward A. Woolley, Lawless & Woolley, New York City, for amicus curiae Institute of Intern. Container Lessors, Ltd.

Before ADAMS and SLOVITER, Circuit Judges, and VAN ARTSDALEN,* District Judge.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

A Pennsylvania statute, enacted in 1980 as an amendment to its Motor Vehicle Code, requires that all "motor carrier vehicles", *i.e.*, truck, truck tractors, and combinations, whether or not registered in Pennsylvania, must be periodically inspected either under the law of Pennsylvania or some other state. The district court held that this provision imposes an unconstitutional burden on interstate commerce and issued a declaratory judgment and a permanent injunction against its enforcement. *American Trucking Associations, Inc. v. Larson*, 515 F.Supp. 1327 (M.D.Pa.1981). Pennsylvania, acting through its relevant public officials (hereafter referred to collectively as "Pennsylvania"), appeals. We reverse the judgment of the district court.

---

* Honorable Donald W. VanArtsdalen, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## II.

The statute at issue provides that "[n]o motor carrier vehicle shall be operated on a highway unless it displays a currently valid certificate of inspection issued under this chapter or by another state."[1] 75 Pa.Cons. Stat.Ann. § 4703(a)(2) (Purdon). Section 102 of the Code defines "motor carrier vehicle" as "[a] truck, truck tractor or combination having a gross weight or registered gross weight in excess of 17,000 pounds." 75 Pa.Cons.Stat.Ann. § 102. A "combination" is defined as "[t]wo or more vehicles physically interconnected in tandem." *Id.*

On August 16, 1980 the Pennsylvania Department of Transportation published proposed regulations enforcing section 4703(a)(2). They provide in part:

§ 494.2. Combinations.

Both the towing vehicle and the trailer in a combination having a gross weight or registered gross weight in excess of 17,000 lbs. shall comply with the provisions of section 4703(a)(2) and (c) of the Vehicle Code and this chapter.

§ 494.3. Display of valid certificate of inspection from another state.

Vehicles, including elements of a combination, will be regarded as displaying a currently valid certificate of inspection issued by another state, if:

(1) the vehicle was required to be inspected as a prerequisite to registration and bears a currently valid registration plate; or

(2) the driver exhibits on requests of any police officer or a Department employe engaged in weighing vehicles a currently valid document issued in accordance with the law or regulation of another state evidencing that the vehicle has been inspected.

§ 494.4. Vehicles re-entering this Commonwealth.

Vehicles, including elements of a combination, which have been outside this Commonwealth continuously for 30 days or more and which, at the time of re-entering this Commonwealth do not bear a currently valid certificate of inspection shall be inspected within five days of re-entering this Commonwealth. The driver of the vehicle shall be required at the request of a police officer or Department employe engaged in weighing vehicles ... to provide adequate proof that the vehicle has been outside this Commonwealth continuously for at least 30 days.

10 Pa. Bulletin 3397–98 (to be codified at 67 Pa.Code Ch. 494).

Plaintiffs are American Trucking Associations, Inc. (ATA), a federation composed of state trucking associations; two state trucking associations acting separately; and five trucking companies. Plaintiffs filed suit in the United States District Court for the Middle District of Pennsylvania challenging section 4703(a)(2) and the accompanying regulations as violative of the Commerce Clause and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Subsequently, Steamship Operators Intermodal Committee (SOIC), an unincorporated association whose members are common carriers by water and are engaged in the intermodal transportation of containerized cargo in the interstate and foreign commerce of the United States, was permitted to intervene as a plaintiff.

After hearings, the district court first entered a temporary restraining order and then granted a preliminary injunction against the enforcement of the statutory section in question. After further hearings on the merits, the court rendered the decision which is the subject of this appeal.

The district court held that the purported purpose of this inspection provision is to improve highway safety in Pennsylvania, that the "evidence ... suggests that no correlation exists between mandatory periodical inspections and highway safety," 515 F.Supp. at 1331, that the Pennsylvania law places substantial burdens on interstate commerce, and that the periodic inspection

---

**1.** Section 4703(h) provides that any person violating § 4703 "is guilty of a summary offense and shall, upon conviction, be sentenced to pay a fine of up to $25."

statute "has, at best, insubstantial, slight, and problematical benefits." *Id.* at 1338. The court concluded "that the strong presumption of validity accorded to this legislation has been overcome and that the statute violates the Commerce Clause." *Id.* at 1340.

## III.

Before reviewing the district court's findings and conclusions in light of the evidence presented, it will be useful to consider at the outset the legal standard which federal courts should apply in reviewing state regulation under a Commerce Clause attack. Such an inquiry is seriously handicapped by the failure of the Supreme Court to clarify the standard to be applied. The members of the Court have been sharply divided on this issue. This leaves the inferior federal courts to attempt to fashion a workable analysis from the various, and sometimes inconsistent, opinions of the members of the Court.

■ The Commerce Clause, contained in Article I, § 8 of the Constitution, is phrased as an affirmative grant of power to Congress: "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes...." Once Congress acts pursuant to this plenary power, its pre-emptive effect is established. *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). It is only when Congress has not acted that the issue of state power arises. Although the Commerce Clause does not explicitly limit state interference with interstate commerce, it is well settled that even in the absence of a congressional exercise of this power, the Commerce Clause "prevents the States from erecting barriers to the free flow of interstate commerce." *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978). As Professor Tribe has stated, "All of the doctrine in this area is thus traceable to the Constitution's *negative implications;* it is by interpreting 'these great silences of the Constitution' that the Supreme Court has limited the

scope of what the states might do." L. Tribe, *American Constitutional Law* 320 (1978) (footnote omitted).

Fortuitously, there has appeared at this time a scholarly and provocative analysis of the dormant commerce clause. Eule, *Laying the Dormant Commerce Clause to Rest,* 91 Yale L.J. 425 (1982). It is Professor Eule's thesis that the Commerce Clause was designed to provide Congress with "a tool for encouraging [the] free trade ideal as a means of protecting the nation from self-destruction," *id.* at 435; that such a role is a value-laden one appropriate for Congress but not for the courts which, in the commerce area at least, should focus on discriminatory or disproportionate state legislative treatment of interstate commerce, and that such analysis would be "more comfortably embedded in the privileges and immunities clause of Article IV." *Id.* at 428. Under the present state of the law, the decision in *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 181, 19 L.Ed. 357 (1869), limits application of the privileges and immunities clause to natural persons. As an inferior federal court we are not free to exercise the same license as scholars in disregarding still binding precedent. Accordingly, even if we were persuaded that it is in fact time to rethink the application of the Commerce Clause in cases such as the one before us, we are bound to restrict our analysis within the confines of that clause.

State legislation covering the gamut of commercial activity has been challenged as violative of the Commerce Clause but the Court has frequently emphasized that it is most reluctant to employ the Commerce Clause to invalidate state regulation in the field of safety. "In no field has this deference to state regulation been greater than that of highway safety regulation." *Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. at 443, 98 S.Ct. at 795. *See, e.g., Brotherhood of Locomotive Firemen & Enginemen v. Chicago Rock Island & Pacific Railroad,* 393 U.S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968) (upholding Arkansas laws requiring trains traveling further than specified distances within the state to be

operated by crews of at least a designated minimum number); *South Carolina State Highway Department v. Barnwell Brothers, Inc.*, 303 U.S. 177, 8 S.Ct. 510, 82 L.Ed. 734 (1938) (upholding state regulation which barred from state highways all trucks wider than 90 inches or heavier than 10 tons where 85–90% of trucks used in interstate commerce exceeded these limits); *Bradley v. Public Utilities Commission*, 289 U.S. 92, 53 S.Ct. 577, 77 L.Ed. 1053 (1933) (upholding state's refusal to license interstate carrier over route because of traffic congestion).

It is when the Court, in the name of the Commerce Clause, has invalidated state regulation that a consistent rationale has been more difficult to find. In only three cases in the last 30 terms has the Court invalidated state regulation purportedly enacted in the name of highway safety.[2] It is in these three cases that we must search for an analytic approach.

In *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959), the Court held unconstitutional an Illinois statute requiring contour mudguards on trucks and trailers operated within the state. In nearly every other state "straight flap" mudguards were lawful and, in one state, contour mudguards were prohibited. Not only had the district court stated that it was "conclusively shown that the contour mud flap possesses no advantages over the conventional or straight mud flap," but that court had also stated that "there is rather convincing testimony that use of the contour flap creates hazards previously unknown to those using the highways." *Id.* at 525, 79 S.Ct. at 965. It was conceded that the statute in question severely burdened interstate commerce, a burden the Court characterized as "rather massive." *Id.* at 528, 79 S.Ct. at 967. Although the fact that the Illinois regulation conflicted with that in Arkansas and that vehicles equipped to meet the standards of the Arkansas statute would not comply with the Illinois standard might have supported a finding that the

Illinois statute discriminated against some interstate carriers, the Court did not choose to rest its holding on that basis. Instead, it measured the burden on interstate commerce imposed by the Illinois statute against the alleged safety benefits, and found that the showing of safety benefit was "far too inconclusive" when balanced against the heavy burden which the Illinois mudguard law placed on the interstate movement of trucks and trailers. *Id.* at 530, 79 S.Ct. at 968.

Two significant factors emerge from that decision. First, the Court recognized that the mere fact that a regulation imposed a burden on interstate commerce would not itself justify invalidating that state regulation. The Court stated, "If we had here only a question whether the cost of adjusting an interstate operation to these new local safety regulations prescribed by Illinois unduly burdened interstate commerce, we would have to sustain the law under the authority of the *Sproles* [*Sproles v. Binford*, 286 U.S. 374, 52 S.Ct. 581, 76 L.Ed. 1167 (1932) (local regulation of truck size and weight)], *Barnwell* [*South Carolina State Highway Department v. Barnwell Brothers, Inc., supra* (state control of width and weight of motor trucks and trailers)] and *Maurer* [*Maurer v. Hamilton*, 309 U.S. 598, 60 S.Ct. 726, 84 L.Ed. 969 (1940) (motor carriers prohibited from carrying other vehicles above the cab of the carrier)] cases." *Id.* 359 U.S. at 526, 79 S.Ct. at 966. According to the Court, the *Bibb* case presented a different issue because in the earlier cited cases, the Court was not faced with standards prescribed by one state which conflicted with those prescribed by another. *Id.* Second, the Court observed, "This is one of those cases—few in number—where local safety measures that are nondiscriminatory place an unconstitutional burden on interstate commerce". *Id.* at 529, 79 S.Ct. at 967. Implicit in this observation is the fact that, ordinarily, it is those measures that are discriminatory which are the focus of the Commerce Clause.

2. *See* compilation in Eule, *Laying the Dormant Commerce Clause to Rest*, 91 Yale L.J. 425, 437 nn.60 & 61 (1982).

In two more recent opinions the Court again was presented with state regulations promulgated in the name of highway safety. In *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), the Court considered a Wisconsin statutory scheme which prohibited trucks longer than 55 feet from the state highways without a permit. As a result, most "doubles", tractors pulling two trailers, were prohibited from operating on Wisconsin highways, although 65-foot doubles were permitted in the adjacent states and in all of the states west from Minnesota to Washington through which principal interstate highways ran. Exemptions were authorized under administrative regulation and the state highway commission did permit "trailer trains" to operate double-trailer trucks up to 100 feet long for certain purposes, including transporting of municipal refuse or waste, and also permitted combinations of three vehicles to transport milk to the point of its first processing. *Id.* at 434, 98 S.Ct. at 790.

The trucking companies presented a great deal of evidence supporting their allegation that 65-foot doubles were as safe, if not safer, than 55-foot singles when operated on four-lane highways. *Id.* at 436–37, 98 S.Ct. at 791. The state, however, made no effort to contradict this evidence. *Id.* at 437, 98 S.Ct. at 791. The trucking companies also produced uncontradicted evidence showing that "their operations are disrupted, their costs are raised, and their service is slowed by the challenged regulations." *Id.* at 438, 98 S.Ct. at 792.[3]

All of the eight Justices who took part in the decision agreed the Wisconsin statutory scheme violated the Commerce Clause,[4] but they divided evenly as to the approach courts should use in reviewing state highway safety regulations. Justice Powell, writing the opinion for the Court, used a "balancing" approach stating that "the inquiry necessarily involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Id.* at 441, 98 S.Ct. at 794. He reiterated the language in *Bibb* which required that those who challenge state regulations said to promote highway safety must overcome a "strong presumption of their validity," *id.* 434 U.S. at 444, 98 S.Ct. at 795, but found that the evidence produced on the safety issue was "so overwhelmingly one-sided" that the Court was "persuaded that the challenged regulations violate the Commerce Clause because they place a substantial burden on interstate commerce and they cannot be said to make more than the most speculative contribution to highway safety." *Id.* at 447, 98 S.Ct. at 797, Justice Powell stated that the conclusion that the regulations cannot stand was buttressed "by the maze of exemptions from the general truck-length limit that the State itself allows." *Id.* at 445, 98 S.Ct. at 796.[5]

Justice Blackmun wrote a concurring opinion for four members of the Court. Although he, too, accepted the concept that safety considerations must be balanced against burdens on interstate commerce, he wrote separately, apparently to emphasize the more limited role of the courts in such balancing. Whereas Justice Powell, for his group of four, had relied on *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), where the Court held the Commerce Clause prohibited Arizona

---

**3.** In this regard, the Court observed that in order to comply with Wisconsin law, "an interstate double bound for Wisconsin must stop before entering the State and detach one of its two trailers." 434 U.S. at 438, 98 S.Ct. at 792. One trucker maintained a crew of drivers in Wisconsin whose sole responsibility was to shuttle second trailers to and from the state line. *Id.*

**4.** Justice Stevens took no part in the consideration or decision of the case.

**5.** The Court noted in this regard that several of the exceptions discriminated in favor of Wisconsin industries and stated that "[e]xemptions of this kind ... weaken the presumption in favor of the validity of the general limit, because they undermine the assumption that the State's own political processes will act as a check on local regulations that unduly burden interstate commerce." *Id.* at 447, 98 S.Ct. at 797.

from requiring locally produced cantaloupes to be crated there because the state's interest was not important enough to justify the burden on commerce, Justice Blackmun distinguished local regulations dealing with highway safety. He wrote, "[N]either the *Pike* opinion nor today's decision suggests that a similar balance would be struck when a State legitimately asserts the existence of a safety justification for a regulation." *Id.*, 434 U.S. at 449, 98 S.Ct. at 798. He continued that, "if safety justifications are not illusory, the Court will not second-guess legislative judgment about their importance in comparison with related burdens on interstate commerce." *Id.* Justice Blackmun stated that he joined in the opinion of the Court because the Court did not "engage in a balance of policies" nor "make a legislative choice." *Id.* at 450, 98 S.Ct. at 798. He read the Court's opinion to signify that in light of the factual record developed by the parties, "the safety interests have not been shown to exist as a matter of law." *Id.*

More recently, in *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981), the Court considered an Iowa statutory scheme almost identical to the Wisconsin statute invalidated in *Raymond*. Again, there were exemptions permitted. Cities abutting the state line could adopt the length limitations of the adjoining state, which would permit oversized trucks to operate within the city limits and in nearby commercial zones. Iowa truck manufacturers could obtain a permit to ship trucks as large as 70 feet. Permits were also available to move oversized mobile homes, provided that the unit was to be moved from a point within Iowa or delivered for an Iowa resident.

The Court openly divided on the issue of which analytical approach to apply in examining the constitutionality of Iowa's scheme and no opinion was denominated as the Opinion of the Court. Justice Powell, joined by Justices White, Blackmun and Stevens, announced the judgment of the Court. His plurality opinion used the balancing approach. He acknowledged the strong presumption of validity given to regulations that touch upon safety, especially highway safety, but stated, "Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause." *Id.* 450 at 670, 101 S.Ct. at 1316. In undertaking to make that balance, Justice Powell acknowledged that Iowa introduced more evidence on the question of safety than did Wisconsin in *Raymond*. He found, however, that the record supported the finding by the district court that 65-foot doubles were as safe as either 60-foot doubles or 55-foot singles and that the trucking company had demonstrated that Iowa's law substantially burdened interstate commerce. He noted that each of the other options available to trucking companies substantially increased the costs of trucking and might tend to increase the number of highway accidents because they entailed driving more highway mileage. He declined to defer to the state legislative judgment because the local regulation bore disproportionately on out-of-state residents and businesses in allowing several exemptions "that secure to Iowans many of the benefits of large trucks while shunting to neighboring States many of the costs associated with their use." *Id.* at 676, 101 S.Ct. at 1318.

Justice Brennan, joined by Justice Marshall, concurred in the judgment of the Court, but analyzed the case very differently, stating at the outset:

For me, analysis of Commerce Clause challenges to state regulations must take into account three principles: (1) The courts are not empowered to second-guess the empirical judgments of lawmakers concerning the utility of legislation. (2) The burdens imposed on commerce must be balanced against the local benefits actually sought to be achieved by the State's lawmakers, and not against those suggested after the fact by counsel. (3) Protectionist legislation is unconstitutional under the Commerce Clause, even if the burdens and benefits are related to safety rather than economics.

*Id.* at 679–80, 101 S.Ct. at 1320. For Justice Brennan, the only relevant evidence "concerns whether the lawmakers could rationally have believed that the challenged regulation would foster" the "regulatory purposes identified by the lawmakers." *Id.* at 680, 101 S.Ct. at 1320. He concurred in the judgment that the statute violated the Commerce Clause because he concluded that the actual goal of the Iowa legislature was to discourage interstate truck traffic on Iowa's highways and therefore the statute was unconstitutional "protectionist legislation". Significantly, Justice Brennan expressly rejected the balancing approach utilized by Justice Powell:

> Moreover, I would emphasize that *in the field of safety*—and perhaps in other fields where the decisions of state lawmakers are deserving of a heightened degree of deference—*the role of the courts is not to balance* asserted burdens against intended benefits as it is in other fields.... In the field of safety, once the court has established that the intended safety benefit is not illusory, insubstantial, or nonexistent, it must defer to the State's lawmakers on the appropriate balance to be struck against other interests. I therefore disagree with my Brother Powell when he asserts that the degree of interference with interstate commerce may in the first instance be "weighed" against the State's safety interests.

*Id.* at 681 n.1, 101 S.Ct. at 1321 n.1 (emphasis added).

In a dissenting opinion, Justice Rehnquist, joined by Chief Justice Burger and Justice Stewart, rejected both the weighing test of Justice Powell and Justice Brennan's emphasis on the actual purposes of the lawmakers. Emphasizing that "[t]he Commerce Clause is, after all, a grant of authority to Congress, not to the courts" and that those challenging a highway safety regulation must overcome a strong presumption of validity, he stated that the Court should not "directly compare safety benefits to commerce costs and strike down the legislation if the latter can be said in some vague sense to 'outweigh' the former." *Id.* at

690–91, 101 S.Ct. at 1325–26. In his view the Court was limited "to determin[ing] if the asserted safety justification, although rational, is merely a pretext for discrimination against interstate commerce. We will conclude that it is if the safety benefits from the regulation are demonstrably trivial while the burden on commerce is great." *Id.* at 692, 101 S.Ct. at 1327. Justice Rehnquist framed the question as "whether it can be said that the benefits flowing to Iowa from a rational truck-length limitation are 'slight or problematical'". *Id.* at 698, 101 S.Ct. at 1330. In his view, Iowa had adduced evidence sufficient to support its safety claim by showing that longer vehicles take greater time to pass, are more likely to clog intersections, and pose greater problems at accident scenes. *Id.* at 694–95, 101 S.Ct. at 1328.

In essence, therefore, this court must choose whether to apply the balancing approach used by Justice Powell or the highly deferential standard espoused by Justice Rehnquist. Although it is attractive to attempt to reconcile them, it would be presumptuous of us to try to do so since the Justices themselves have made explicit their belief that there are significant differences between them. It appears that the Justices have acknowledged, at least implicitly, that Justice Rehnquist's approach is even more deferential to the state's legislative judgments on highway safety issues than the balancing approach articulated by Justice Powell, notwithstanding the "strong presumption of validity" which the latter concedes is warranted. The district court recognized the choice before it. It stated that although it believed the weighing test employed by the plurality in *Kassel* was the proper analysis, it would follow "the narrow view" advocated by Justice Rehnquist in his *Kassel* dissent "rather than become embroiled in this controversy." 515 F.Supp. at 1338.

█ In some cases, perhaps in many cases, the choice between the two approaches which currently divide the Supreme Court may not affect the result. In

this case, we are not confident that the selection of the legal standard would not be outcome determinative. Therefore, we believe it is incumbent upon us to expressly select the standard to be applied. We choose to follow the approach articulated by Justice Rehnquist in his *Kassel* dissent for several reasons. In the first place, if we attempt to align the Justices, it appears that there are five Justices who have rejected the balancing approach in the area of safety regulations, if we count not only the three Justices adhering to Justice Rehnquist's opinion but Justice Brennan and Justice Marshall as well.[6] In the second place, we believe that the more deferential standard is appropriate because issues of highway safety have always been considered of a "peculiarly local nature." *See Bibb*, 359 U.S. at 523, 79 S.Ct. at 964. If the rational basis standard is considered adequate in equal protection cases for evaluating a wide range of state statutes and regulations, a similarly deferential standard should suffice as the standard for evaluating nondiscriminatory state commercial regulations in the field of highway safety.

Finally, we are particularly reluctant to superimpose judicial values over legislative values in the safety area. The balancing approach as applied in the plurality opinion in *Kassel* entailed making subtle distinctions on the basis of vigorously contested facts and inferences. We believe that the halls of the state legislature are a more appropriate forum for resolution of these disputes than are the walls of a judge's chambers. Because the legislative process itself involves balancing the benefits to the public interest against the restraints imposed on the affected businesses, many of whom are voters, the concern expressed by the dissent about hypothetical statutes requiring luminous trucks, a thirty-five mile per hour highway speed limit or weekly inspections, dissenting op. at 803, are unlikely examples since they would have had to survive the legislature's scrutiny and debate. As long as the statute does not on its face or in fact discriminate against out-of-state interests or in favor of in-state interests, there is ample protection from such legislation in the democratic process itself. Therefore, we will review the record to determine whether the "strong presumption of validity" accorded Pennsylvania's highway safety measures has been overcome by a showing that the safety benefits were "slight or problematical" or, as alternatively but equivalently phrased, merely "illusory".

## IV.

There was a mass of evidence introduced in this case by the parties on both sides. In addition to the one day of testimony before issuance of the temporary restraining order, the hearing on the preliminary injunction occupied four days and the hearing on the merits occupied another five days.

With regard to the nature and extent of the burden on interstate commerce, the dis-

---

**6.** In his *Kassel* opinion Justice Rehnquist noted that "a majority of the Court goes on record today as agreeing that courts in Commerce Clause cases do not sit to weigh safety benefits against burdens on commerce when the safety benefits are not illusory." 450 U.S. at 692 n.4, 101 S.Ct. at 1327 n.4. He also stated that "only four Justices invalidate Iowa's law on the basis of the analysis in *Raymond*." *Id.*, 450 U.S. at 700 n.10, 101 S.Ct. at 1331 n.10. Justice Powell, however, expressly noted his disagreement with this latter conclusion, stating that the analysis in *Raymond* "was joined by each of the eight Justices who participated" and that "Justice Brennan finds it unnecessary to reach the *Raymond* analysis because he finds the Iowa statute to be flawed for a threshold reason." *Id.* 450 U.S. at 679 n.27, 101 S.Ct. at 1320. We do not believe that the Court's recent decision in *Sporhase v. Nebraska*, —— U.S. ——, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982), suggests that a majority of the Justices would adopt a balancing approach in a case such as this one involving a non-discriminatory highway safety regulation. *See* dissenting at 801 n.1. In *Sporhase* the Court considered a Commerce Clause challenge to a Nebraska water conservation measure which placed restrictions on the withdrawal of ground water from any well within Nebraska intended for use in an adjoining state. In invalidating a portion of the statute, the Court focused on its "facially discriminatory" nature. *Id.* at ——, 102 S.Ct. 3465. Further, the case did not involve a challenge to a highway safety regulation, to which the Court has traditionally afforded a greater degree of deference than in other fields of state regulation.

trict court found that 25 states and the District of Columbia have some type of periodic inspection program that would fulfill the requirements of section 4703(a)(2). Six of these states exempt from their inspection requirement interstate motor vehicles subject to regulation by the Federal Bureau of Motor Carrier Safety (BMCS). 515 F.Supp. at 1330. The court found that approximately 231,000 tractors and 700,000 trailers are not currently required to be inspected by any state, and thus, if operated in Pennsylvania, would be subject to its section 4703(a)(2) inspection requirement. *Id.* No state other than Pennsylvania requires inspection of vehicles registered in another state. *Id.*

The average tractor inspection was found to take at least 90 minutes and the average trailer inspection 30 minutes. *Id.* at 1332–33. The court noted that uninspected vehicles will often travel through Pennsylvania at night when many inspection stations will not be open, and that "[e]ven if a driver can find an inspection station, perishable items may be damaged because of the delay required by inspection." *Id.* at 1334. The out-of-pocket cost for each inspection of a semitrailer at an official inspection station ranges from $12 to $18, and there would be further costs connected with drivers' salaries and additional fuel consumption while taking vehicles to an inspection station. *Id.* at 1333. The court stated that if the truckers were to circumvent Pennsylvania rather than getting an inspection, "[t]he costs of this choice are enormous in terms of additional time and fuel consumption." *Id.* at 1334.

Based on the costs and burdens associated with inspections, the district court found that the burden on interstate commerce is substantial. The court stated that "as in *Raymond*, [plaintiffs] 'produced uncontradicted evidence showing that their operations [would be] disrupted, their costs [would be] raised, and their service . . . slowed . . .' if the inspection statute is permitted to go into effect." *Id.* at 1340. The Commonwealth does not challenge the fact that interstate commerce is affected by the statute, but characterizes the effect as an "incidental impact". Commonwealth's brief at 7.

On the other hand, the Commonwealth vigorously challenges as clearly erroneous the district court's finding that section 4703(a)(2) was not a legitimate safety measure. Unlike the state in *Raymond* which "virtually defaulted in its defense of the regulations as a safety measure", *Raymond*, 434 U.S. at 444, 98 S.Ct. at 795. Pennsylvania introduced a broad array of evidence designed to show that the statute was indeed a valid safety measure. The Commonwealth introduced evidence that: national and local accident statistics show a significant increase in the number of accidents involving motor carrier vehicles, App. at 1052, 1169–70; in inspections of interstate motor carrier vehicles on Pennsylvania highways conducted by the BMCS, with the assistance of the Pennsylvania State Police, a significant percentage of the vehicles were found to have defects which warranted their being placed out of service, App. at 1054–1107; 1113–1126; in comparison to all motor vehicles, motor carrier vehicles (large trucks etc.) are involved in a disproportionately large number of accidents in Pennsylvania for which vehicle failure is a factor contributing to the accident. App. at 1052–53; in Pennsylvania factors such as geography, climate, roadway design and topography interrelate to create special safety problems for truck travel upon Pennsylvania roads, App. at 831–850; Pennsylvania's inspection program is designed to and will correct and prevent mechanical failure and deterioration. App. at 657–684; and there is a relationship between low incidence of mechanical defects and periodic inspection, App. at 1175–1182. The truckers attacked the validity of the statistics, surveys and studies which had been introduced by the Commonwealth and also introduced evidence in their case in chief designed to show the illusory benefits of section 4703(a)(2).

There are two critical factual issues which emerge from the extensive evidence in this case. One is whether there is a relationship between mechanical defects in motor carrier vehicles and accidents, and

the second is whether there is a relationship between inspection and the timely discovery of such mechanical defects. In finding that section 4703(a)(2) "has only illusory, slight, or problematical safety benefits," the district court found:

(1) "[N]o relationship is shown to exist between mechanical defects in vehicles and accidents caused by such vehicles," 515 F.Supp. at 1331; and

(2) "[S]emiannual or annual inspections of high mileage vehicles such as motor carrier vehicles are insufficient to discover and correct mechanical defects" because such inspections will only detect the condition of the vehicle at the time the inspection is made and do not guarantee the safety of a vehicle in the future. *Id.* at 1331–32. As a subsidiary finding, the court also found that "tractor-trailer combinations from non-inspecting states did not have a statistically disproportionate percentage of accidents than tractor-trailer combinations registered in inspection states." *Id.* at 1331.[7]

The Commonwealth argues that the court's "inference" rejecting the relationship between mechanical defects and accidents "is founded upon an erroneous thesis and a misunderstanding of statistical evidence." Commonwealth's brief at 10. It is apparent from the district court's opinion that the court made the finding rejecting any relationship between mechanical defects and accidents on the basis of the disparity between the percentage of motor carrier vehicles found hazardous and placed out of service in selective and random BMCS inspections on Pennsylvania highways (between 40% and 60% of such vehicles) and the percentage of motor carrier vehicles involved in accidents which had a vehicle failure cited as a contributing cause (8.8%). However, we agree with the Commonwealth that there is no basis to assume that there should be a perfect or even a close correlation between these two figures. Some motor carrier vehicles traveling the highways with mechanical defects will get into accidents, but many others will not, for a variety of reasons. Also, the statistics compared by the district court do not come from comparable pools. The 8.8% figure came not from BMCS inspections but from police accident reports made by police officers who are primarily concerned with the emergency conditions at the accident scene and who therefore seldom undertake a serious examination of the vehicles. There was testimony that the attribution of accidents to motor vehicle defects was understated and that the true figure would more realistically be in the 25% range. App. at 627.

The district court indicated that its conclusion of the lack of relationship between mechanical defects and accidents was also based at least in part on a motor vehicle inspection report issued by Pennsylvania's Office of Budget and Administration in January 1981 which stated that "the association between vehicle defects and motor vehicle accidents is, at best, tenuous." 515 F.Supp. at 1331 n.15. We believe reliance on that report was inappropriate. The report was not introduced into evidence at trial.[8] Although the district court stated it used that report only to "corroborate" the evidence presented at trial, *id.*, that report does not rise to the level of the evidence of which a district court may take judicial notice, particularly when the inferences and conclusions to be derived from its statements are subject to dispute. Even if the report could have been properly considered, it does not support the proposition for which it was used by the district court because it was not directed to motor carrier vehicles but to all motor vehicles, of which motor carrier vehicles comprise only a small percentage. The report did not recommend the elimination of all inspections, but only

---

7. The statistical evidence relied upon for this finding was challenged because assignment of combinations to states was made only on the basis of registration of the tractor, not the trailer, and because the accidents reported were not limited to those caused by mechanical failure. In our view of the issue, we believe it unnecessary to resolve the dispute as to this finding which we consider, at most, subsidiary.

8. The motion of the intervenor in February 1981 to reopen the trial to introduce this report was denied. 515 F.Supp. at 1331 n.15.

replacement of semiannual for annual inspection. App. at 1392. Unlike the district court, the Commonwealth did not interpret its own report to negate a connection between mechanical defects in motor carrier vehicles and accidents. Pennsylvania's Governor Thornburgh used the report as the basis for his proposal to replace twice-a-year inspection with once-a-year inspection for vehicles *other than* heavy trucks. App. at 1346. The Governor recommended that the twice-a-year inspection should continue as to heavy trucks, and the legislation passed in that manner. Act No. 1982–129 (May 26, 1982). Thus, Pennsylvania has manifested its continued belief in inspection of heavy trucks as a valid safety measure.

In making the finding that inspections will not discover mechanical defects, the district court made two points: all interstate carriers are already subject to the federal inspection requirements, set forth by the BMCS in 49 C.F.R. § 396, which require that motor carriers systematically inspect their vehicles and that truck drivers make safety reports and conduct certain daily self-inspections of their trucks, 515 F.Supp. at 1332; [9] and the deterioration and failure of motor carrier vehicles occur "slowly and progressively, without predictability of when a mechanical failure might occur," whereas an inspection will only detect the condition of the vehicle at the time the inspection is made. *Id.* The district court also noted that the Commonwealth's own expert, Dr. James Schuster, had testified that on high mileage motor carrier vehicles one inspection per year is not adequate. *Id.* at 1339 n.42.

The Commonwealth points out, however, that it introduced the sole testimony on the issue of the occurrence and progression of mechanical and structural failures in motor carrier vehicles and established, *inter alia*, the following: (1) that mechanical failures generally are slow and progressive in nature and that very few of the failures are instantaneous, App. at 665–66; and (2) that although the precise point of mechanical failure is not predictable, "the effects of this deterioration and failure [can] be detected by an inspection," App. at 666–67; and (3) that the Commonwealth's program will detect, correct and prevent failure and deterioration "before they reach the final stage of failure," App. at 684. With regard to Dr. Schuster's testimony, it supports rather than disproves the Commonwealth's position, since Dr. Schuster actually testified that while a twice-a-year inspection requirement is reasonable for high mileage motor carrier vehicles, a once-a-year requirement (which section 4703(a)(2) would permit) "*alone* ... is not adequate." App. at 882 (emphasis added). Since all interstate carriers are already subject to BMCS in-house self-inspection requirements, the Pennsylvania inspection requirement would never be imposed alone.

█ Pennsylvania's inspection requirement is significantly different than the regulations invalidated in *Bibb, Raymond,* and *Kassel.* Unlike the state law in *Bibb,* Pennsylvania's inspection requirement does not conflict with that of any other state. Pennsylvania does not require that the requisite inspection be performed under its own system, but instead accepts the inspection of any other state, under whatever standard that state imposes. Unlike the regulations in *Raymond,* Pennsylvania does not discriminate in favor of local industry,[10] and unlike

**9.** There has been no suggestion that the BMCS requirements have pre-empted state-imposed inspection requirements.

**10.** Plaintiffs' argument that the statute discriminates against out-of-state motor carriers because Pennsylvania motor carriers were already subject to a state inspection program misapprehends the issue. Discrimination against interstate commerce entails imposing a burden on out-of-state vehicles which is not imposed on in-state vehicles or favoring those

from in-state without a comparable favor for those from out-of-state. *Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), relied upon by plaintiff-ATA, is distinguishable. That case is more like *Bibb* since the North Carolina statute which required all closed containers of apples to display *only* the applicable U.S.D.A. grade was inconsistent with the practice of Washington state apple growers whose containers were preprinted with a different grade classification.

the regulations in *Kassel,* Pennsylvania's law does not contain exemptions which throw into question the legitimacy of its regulation system. If, as is likely, the principal function of the Commerce Clause today is to prevent discrimination against interstate commerce, then once it is conceded that there is no such discrimination, either facially or in application, the inquiry as to the burden on interstate commerce should end. *See* Eule, 91 Yale L.J. at 469–72.

■ From our review of all the evidence on the record, we believe that although the district court stated it was going to apply the highly deferential approach advocated by Justice Rehnquist, which we have also adopted, in fact it did not do so. Instead, there are clear indications from the opinion that the district court undertook to decide whether the evidence presented by the Commonwealth convinced it that inspections were desirable. In doing so, it imposed far too onerous a burden on the Commonwealth. For example, in rejecting the evidence of some relationship between mechanical defects and accidents, the court gave no credence to the surveys introduced by the Commonwealth which showed a relationship between a low incidence of mechanical defects and periodic inspections. 515 F.Supp. at 1331 n.13. While all of the surveys introduced in the record, whether by plaintiffs or the Commonwealth, suffer from serious flaws which undermine their utility, the district court failed to appreciate the significance of the Commonwealth's evidence, accepted by the district court, that 8.8% of the tractor-trailers involved in accidents in Pennsylvania during 1979 were reported to have had a vehicle failure as a factor contributing to the accident. Defendant's Exhibit No. 1. That figure in itself suggests that there is at least some correlation between accidents and mechanical defects. Other exhibits introduced by the truckers themselves likewise show a correlation between accidents and mechanical defects. *See, e.g.,* ATA Exhibit No. 15 (App. at 1231) (PennDOT data showing that in 1978, 8.45% of the tractor-trailer accidents in Pennsylvania involved vehicle failure); ATA Exhibit No. 9 (App. at 1229)

(BMCS report that a mechanical defect or failure was cited as involved in 4.9% of the 1976 interstate motor carrier accidents, 4.8% for 1977, and 4.7% for 1978).

It was not necessary for the state to prove that uninspected motor carrier vehicles are, by definition, unsafe, a burden that the district court appears to have imposed upon it. Instead, the state merely was obliged to show that the legislature had a reasonable basis to believe that inspection of motor carrier vehicles was likely to discover some defective vehicles and that some vehicle defects contribute to accidents. The Commonwealth produced more than sufficient evidence to support its claim that inspections of motor vehicles have some, even if not overwhelming, safety benefits. We need not decide whether that evidence would have convinced us that an inspection requirement was warranted, nor do we sit to decide the wisdom of the legislative decision. We believe the record shows that there was ample evidence to support the legislature's choice when reviewed under a standard giving substantial deference to the legislature.

It is even probable that were the evidence evaluated under the test which requires that the court weigh the interstate burden of a regulation against its safety benefits, Pennsylvania's inspection requirement would survive. In *Raymond,* the Court noted that the state had failed to make "a colorable showing" that its regulations contributed to highway safety. 434 U.S. at 447–48, 98 S.Ct. at 797. It is difficult to conclude that Pennsylvania has not met that minimal requirement, particularly when it is balanced against a burden on interstate commerce stemming merely from an inspection requirement rather than total exclusion, as in the case of oversized vehicles. The district court made no findings under this standard, and since we have adopted an even more deferential standard, we do not decide the issue.

V.

■ Because of our disposition of the Commerce Clause challenge, we must reach

the appellees' Fourteenth Amendment arguments which the district court did not address. The intervenor, SOIC, argues that the statute violates equal protection and due process requirements because it regulates chassis used to transport steamship containers to and from ports in the United States while excluding automobiles. SOIC claims this "is totally arbitrary" in light of the testimony regarding their comparative safety. SOIC brief at 39. SOIC relies upon evidence establishing a very low incidence of accidents in which the contributing cause was related to defects in the chassis equipment. SOIC does not, however, cite to any evidence specifically comparing the safety record of chassis and automobiles. The Commonwealth, on the other hand, argues that the inclusion of chassis and the exclusion of automobiles need only be rationally related to the state's safety objectives and that there is no constitutional requirement that its regulation must reach every class to which it might be applied. This position is correct. "States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). The state is not obliged to ameliorate a perceived evil in one fell swoop.

The legislature could reasonably decide that tractor-trailer combinations, including those using a chassis rather than a trailer, represented a distinct category of vehicles with special safety problems which warranted a more stringent safety inspection requirement than imposed on automobiles. The Commonwealth introduced evidence showing a significantly higher percentage of mechanical defects cited as contributing factors in accidents involving tractor-trailer combinations than for all motor vehicles. App. at 360–61; 1052–53. There was a substantially higher increase in reported fatal and injury accidents involving tractor-trailer combinations than motor vehicles. App. at 358–59; 1052–53. The legislature also could reasonably have determined that vehicle weight is rationally related to highway safety, a fact recognized in the Supreme Court cases. *See, e.g., Maurer v. Hamilton,* 309 U.S. 598, 609, 60 S.Ct. 726, 732, 84 L.Ed. 969 (1940); *Kassel,* 450 U.S. at 693–94, 101 S.Ct. at 1328 (Rehnquist, J., dissenting). The state was not obliged to present statistical evidence establishing a causal relation between the weight of a vehicle and the incidence of accidents caused by mechanical defects. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 463–64, 101 S.Ct. 715, 723–24, 66 L.Ed.2d 659 (1981).[11]

■ SOIC also contends that the statute violates the Due Process Clause because there is no evidence establishing that the out-of-state inspections acceptable under section 4703(a)(2) are comparable in their frequency and details with that required in Pennsylvania. According to SOIC, the statute's silence with regard to details of the other states' inspection programs means that the statute does not, as a matter of law, constitute an exercise of Pennsylvania's police power which is reasonably calculated to promote public safety on its highways. Since we have already concluded that the Pennsylvania statutory scheme is reasonably related to safety, the legislature could reasonably have believed that compliance with at least some inspection program in some other state, albeit not as stringent as Pennsylvania's, would further its safety purposes, and represented a reasonable accommodation to truckers already inspected elsewhere.

■ Finally, ATA contends that the statute violates the Due Process Clause on grounds of vagueness, claiming that Pennsylvania enforcement officials disagreed at trial as to whether the inspection programs of states such as New Jersey, Maryland,

11. We also reject as without merit the argument of the amicus curiae. Institute of International Container Lessors, Ltd., that the proposed regulations "exceed the requirements of the statute" because they require that chassis and trailers, as well as the towing vehicle, comply with the inspection provision.

and California would satisfy the inspection requirement, and that the Act and regulations promulgated thereunder permit too much discretion in enforcement by the individual trooper regarding the five-day grace period given those vehicles which provide "adequate proof" that they have been outside the state for 30 days.

We do not believe that section 4703(a)(2) or its accompanying regulations are unconstitutionally vague. It is clear on the face of the statute that the provision prohibits motor carrier vehicles from operating on Pennsylvania highways without a valid certificate of inspection. The application of the statutory provision to particular states is a subject which may be clarified in future administrative regulations. "[W]hile there must be definiteness and ascertainable standards so that men of common intelligence can apprehend the meaning of the ordinance, perfect precision is neither possible nor constitutionally required." *Bykofsky v. Borough of Middletown*, 401 F.Supp. 1242, 1253 (M.D.Pa.1975), *aff'd without opinion*, 535 F.2d 1245 (3d Cir.), *cert. denied*, 429 U.S. 964, 97 S.Ct. 394, 50 L.Ed.2d 333 (1976). *See Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Furthermore, while the regulations vest some discretion in enforcement of the five-day grace period to officials, we do not believe the regulations have vested those officials with discretion which could lead to impermissible arbitrary enforcement. As the Supreme Court stated in *Grayned v. City of Rockford*, 408 U.S. at 114, 92 S.Ct. at 2302. "As always, enforcement requires the exercise of some degree of police judgment, but, as confined, that degree of judgment here is permissible."

For the foregoing reasons, we will reverse the judgment of the district court

declaring the statute unconstitutional and enjoining its enforcement.

ADAMS, Circuit Judge, dissenting.

There is much in the majority opinion with which I agree. I have no difficulty, for example, with the proposition that states are entitled to considerable deference in their legitimate and nondiscriminatory attempts to promote safety on the highways. Similarly, I too believe that the judicial role in "dormant" commerce clause cases of this sort should be a relatively limited one, not only because courts generally are ill-equipped to evaluate the wisdom of legislation intended to promote safety, but also because Congress always retains the ability, through the exercise of its plenary powers, to invalidate any state regulation that it deems to be an intrusion on the commercial interests of the nation. Nonetheless, I do not join my colleagues in upholding the Pennsylvania truck inspection statute challenged here. My divergence from the majority can be briefly stated: I believe that the balancing test is the better of the two standards for resolving dormant commerce clause disputes and that, when this test is applied, the balance weighs against the Commonwealth's legislative effort.

I

As the majority opinion aptly demonstrates, the Supreme Court has not yet arrived at an agreed-upon standard for determining the constitutionality of a state's safety-related legislation that allegedly interferes with interstate commerce. In essence, because a majority of the Justices has been unable to endorse either of the two competing tests,[1] "this court must

---

1. It is tempting to conclude, as does the majority in this case, *see* at 794, that a majority of the Supreme Court in *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981), rejected the use of a balancing test in evaluating the constitutionality of safety-related legislation. To be sure, three Justices (only two of whom, however, remain on the Court) sharply criticized the plurality's balancing approach. The significance

of Justice Brennan's concurring opinion (which was joined by Justice Marshall) is more difficult to assess. Both Justices Brennan and Marshall joined the opinion of the Court in *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978), in which a balancing test was employed. Then, too, Justice Brennan's concurring opinion in *Kassel* does not directly take issue with the observation of the plurality that "Justice Brennan finds

choose whether to apply the balancing approach used by Justice Powell or the highly deferential standard espoused by Justice Rehnquist." Majority Opinion at 794.

For three reasons, my colleagues endorse the deferential standard of review; that is, they accord the Pennsylvania inspection statute a "strong presumption of validity" and ultimately conclude that the plaintiffs here were unable to demonstrate that the safety benefits intended to be realized by the measure were "slight," "problematical," or "illusory." *Id.* at 795. First, the majority notes that five Justices appear to have rejected the legitimacy of balancing competing interests when safety regulations are involved. As previously discussed, however, *see* note 1 *supra*, I do not believe it can be said that either of the two competing approaches has received the imprimatur of a Supreme Court majority. Second, my colleagues contend that, as long as the rational relation standard of review is considered adequate in assessing the constitutionality of various state commercial statutes and regulations, a "similarly deferential standard" is in order when reviewing highway safety legislation of a "peculiarly local nature." I of course cannot quarrel with the notion that the "bite" of judicial

review should be at a minimum in those situations in which a state draws distinctions among its citizens that neither impinge upon a fundamental right nor discriminate against a suspect class. *See Murillo v. Bambrick*, 681 F.2d 898 (3d Cir. 1982). I am not convinced, however, that the equal protection analogy applies with respect to commerce clause questions: after all, when a state acts to burden interstate commerce, whatever its motivations, it affects the activities and interests not only of its own citizens, but also those of unrepresented outsiders (such as the truckers complaining in the matter at bar). It is not improbable, therefore, that an economic policy that might appear rational from the perspective of the enacting state would be antithetical to the commercial interests of the nation as a whole.[2] Third and finally, the majority suggests that "the halls of the state legislature are a more appropriate forum for resolution of [highway safety] disputes than are the walls of a judge's chambers." At 795. I am not persuaded, however, that absolute judicial reticence is appropriate when reviewing the actions of *state* legislatures, whose safety-related judgments, essentially attuned to local considerations, do not necessarily reflect an

it unnecessary to reach the *Raymond* analysis because he finds the Iowa statute to be flawed for a threshold reason" (*viz*, that the Iowa act constituted "protectionist legislation"). 450 U.S. at 679 n.27, 101 S.Ct. at 1320 n.27. Moreover, Justice Brennan's concurrence in *Kassel* stressed that the appropriate focus in commerce clause cases should be on "the [actual] regulatory purposes identified by the lawmakers and on the evidence before or available to them that might have supported their judgment." *Id.* at 680, 101 S.Ct. at 1320. With respect to the matter *sub judice*, however, no legislative discussion accompanied the Commonwealth's enactment of the truck inspection statute. *See American Trucking Ass'ns, Inc. v. Larson*, 515 F.Supp. 1327, 1329 n.4 (M.D.Pa. 1981). In *Kassel*, Justice Brennan emphasized that "[w]here there is no evidence bearing on the actual purpose for a legislative classification, our analysis necessarily focuses on the suggestions of counsel," and therefore " 'marginally more demanding scrutiny' is appropriate to 'test the plausibility of the tendered purpose.' " 450 U.S. at 682 n.3, 101 S.Ct. at 1322 n.3 (quoting *Schweiker v. Wilson*, 450 U.S. 221, 245, 101 S.Ct. 1074, 1086, 67 L.Ed.2d 186 (1981)

(Powell, J., dissenting)). A reading of the relevant cases, then, convinces me that to date no single approach to the commerce clause has attracted a majority of the Justices. I also note that, very recently, seven Justices joined in applying the balancing test (as set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)) to a state statute deemed by the Court to fall into the "health and safety regulation" category. *See Sporhase v. Nebraska*, —— U.S. ——, ——, 102 S.Ct. 3456, 3464, 73 L.Ed.2d 1254 (1982).

2. *See, e.g., Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed. 1032 (1935) ("one state in its dealings with another may not place itself in a position of economic isolation" because "[r]estrictions so contrived are an unreasonable clog upon the mobility of commerce"); *The Supreme Court, 1980 Term*, 95 Harv.L.Rev. 91, 101–02 (1981) (arguing that increased state economic regulation, and the resulting nonuniformity, may undercut federal efforts at deregulation and may force the Court "to defend national interests more strenuously in the future").

adequate comprehension or consideration of the burdens placed on interstate intercourse.[3]

In my view, the better analytical approach to dormant commerce clause matters is the "sensitive" balancing advocated by the plurality in *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981).[4] Under this standard, "the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack." *Id.* 450 U.S. at 670, 101 S.Ct. at 1316. Rather, a reviewing court is obligated to engage in a careful " 'weighing of the asserted safety purpose against the degree of interference with interstate commerce.' " *Id.* (quoting *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 443, 98 S.Ct. 787, 795, 54 L.Ed.2d 664 (1978)). Ordinarily, because of their "strong presumption of validity," *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 524, 79 S.Ct. 962, 964, 3 L.Ed.2d 1003 (1959), state and local regulations intended to advance highway safety will withstand constitutional attack. In some—admittedly rare—cases, however, state restrictions may "further the [safety]

purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause." *Kassel*, 450 U.S. at 670, 101 S.Ct. at 1316.

The reason for favoring the balancing over the deferential test derives from a recognition that situations may arise where enormous burdens are placed on interstate commerce by nondiscriminatory, non-illusory state safety statutes. In these instances, I believe it unwise and imprudent for a federal court to ignore significant and sizeable infringements on national commercial interests solely because some, arguably marginal, local safety objective is served. A few examples may suffice. It doubtless would increase highway safety were a state to mandate that all trucks traveling on its roads be covered with luminous paint, be driven at speeds not to exceed thirty five miles per hour, or be inspected weekly. Under the deferential standard of commerce clause review, having made such a determination, a court's inquiry must end. It is troubling, however, to accept an analysis that excludes from the decisionmaking calculus the tremendous burdens placed on interstate commerce by each of these (rath-

---

**3.** It has been maintained, *see Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 690, 101 S.Ct. 1309, 1326, 67 L.Ed.2d 580 (1981) (Rehnquist, J., dissenting); Eule, *Laying the Dormant Commerce Clause to Rest*, 91 Yale L.J. 425, 435–37 (1982), that courts should defer to state regulations that impinge on interstate commerce, on the ground that, with respect to any given state statute, non-action by Congress must imply consent. To date, however, the Supreme Court has neither endorsed nor demanded this type of judicial restraint. Moreover, it is arguable that increased judicial deference would be unwise because, at least as a de facto matter, for many years Congress has deferred to the federal courts to police and protect the commercial interests of the nation. *See* Gibbons, *Keynote Address, Symposium: Constitutional Adjudication and Democratic Theory*, 56 N.Y.U.L.Rev. 260, 264–65 (1981) (defending the Supreme Court's dormant commerce clause jurisprudence on the ground that "[u]sually the Court majority believed it was expressing the true will of the *national* majority") (emphasis added).

**4.** The balancing test favored by the *Kassel* plurality can be traced to *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959), in which the Court invalidated an

Illinois requirement (unique to that State) that truckers install contoured mudflaps on their vehicles. According to the Justices, because " 'the total effect of the law as a safety measure in reducing accidents and casualties is so slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it,' " the statute could not be upheld. *Id.* at 524, 79 S.Ct. at 964 (quoting *Southern Pac. Co. v. Arizona*, 325 U.S. 761, 775–76, 65 S.Ct. 1515, 1523, 89 L.Ed. 1915 (1945)). The *Bibb* standard was invoked and refined in *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 644 (1978) (invalidating a Wisconsin statute governing the length and configuration of trucks): "Our recent decisions make clear that the inquiry necessarily involves a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Id.* at 441, 98 S.Ct. at 794; *see also Edgar v. Mite Corp.*, ––– U.S. –––, ––– –––, 102 S.Ct. 2629, 2640–43, 73 L.Ed.2d 269 (1982); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

er fanciful) regulations. Indeed, it is difficult to reconcile such an approach with the long-standing notion that the commerce clause exists, in part, to "prevent[ ] the States from erecting barriers to the free flow of interstate commerce," *Raymond Motor, supra*, 434 U.S. at 440, 98 S.Ct. at 793; *see Great Atlantic and Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 370–71, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1976) (citing cases).

In my opinion, the better judicial practice would take into account costs as well as benefits; it would balance local safety objectives against "the national interest in keeping interstate commerce free from interferences which seriously impede it," *Bibb, supra*, 359 U.S. at 524, 79 S.Ct. at 964. *See The Supreme Court, 1980 Term, supra* note 2, at 102 (recommending that the Supreme Court "candidly balanc[e] the interests involved" in dormant commerce clause cases, because "[a]lthough a state's interest in safety may be legitimate, it may still be unreasonable in light of the burdens ... imposed on interstate commerce"). Such a stance, it seems to me, comes closest to realizing the Framers' conviction that "in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1730–31, 60 L.Ed.2d 250 (1979); *see H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533–34, 69 S.Ct. 657, 662–63, 93 L.Ed. 865 (1949).

## II

If, then, a balancing standard is to be applied in the matter at bar, I believe that the Pennsylvania statute challenged here cannot survive constitutional scrutiny. The most striking fact that emerges from the testimony and evidence introduced at trial, in my view, is the overwhelming burden placed on interstate commerce by the Commonwealth's highway regulation. The district court found that, once the inspection requirement took effect, nearly one million out-of-state vehicles, currently not required to be examined by any state, would be affected.[5] *American Trucking Associations, Inc. v. Larson*, 515 F.Supp. 1327, 1330 (M.D. Pa.1981). Assuming, of course, that their owners chose not to avoid Pennsylvania highways entirely,[6] these tractors and trailers would have to be inspected, either in the Commonwealth or elsewhere, in order to be operated in accordance with the law on Pennsylvania's roads.

The inspections themselves, according to the district court, involve "considerable costs and delays," *id.* at 1332—a proposition with which the Commonwealth does not take issue. For example, the district court found that: "[t]he cost for each inspection of a semitrailer at an official inspection station ranges from $12.00 to $18.00"; "[t]here also would be further costs connected with drivers' salaries and additional fuel consumption while taking motor carrier vehicles to an inspection station, waiting during the inspection, and returning the vehicle to the owners' place of business or back to its intended course of travel"; "[t]he average tractor inspection takes at least ninety minutes and the average trailer or semitrailer inspection about thirty minutes"; "perishable items may be damaged because of the delay required by inspection"; inspection stations are not open at night, when much of the interstate truck traffic occurs. The district court also cred-

---

5. In fact, this one million figure may represent an underestimation of the actual impact of the Commonwealth's inspection program. The district court found that, although 25 states currently have "some type of periodic inspection program," 6 states exempt from inspection all interstate motor carrier vehicles subject to regulation by the federal Bureau of Motor Carrier Safety (BMCS), and several states have "atypical inspection procedures." *American Trucking, supra*, 515 F.Supp. at 1330.

6. Given the strategic geographic location of the Commonwealth, it is difficult to imagine that circumnavigation would constitute a viable option for most interstate motor carriers. Nonetheless, the district court found that, if this alternative were seriously pursued, the resulting additional transportation costs (measured in both money and time) would be "enormous." *American Trucking, supra*, 515 F.Supp. at 1334.

ited testimony that one, presumably representative, trucking company (Coastal Tank Lines) would be forced to expend more than $150,000 annually in order to comply with the Pennsylvania statute. *Id.* at 1332–34.[7] It is difficult to quarrel with the conclusions drawn by the district court from the record compiled in this case: that the truckers " 'produced uncontradicted evidence showing that their operations [would be] disrupted, their costs [would be] raised, and their service ... slowed' if the inspection statute is permitted to go into effect," and that therefore "the Pennsylvania law places substantial burdens on interstate commerce." *Id.* at 1332, 1340 (quoting *Raymond Motor, supra,* 434 U.S. at 438, 98 S.Ct. at 792).

Although the question is close, I would not disturb the district court's finding that Pennsylvania failed to demonstrate that its inspection program would bring about anything other than "insubstantial, slight, and problematical benefits," *American Trucking, supra,* 515 F.Supp. at 1338. To be sure, it borders on the intuitive that, at least in some cases, careful inspection of a vehicle may reveal a mechanical defect which, had it gone undetected, might have resulted in an accident. But, as the district court found, interstate trucks already are subject to rigorous inspection requirements: all interstate carriers must satisfy the directives relating to inspection, maintenance, and repair of their vehicles set forth by the federal Bureau of Motor Carrier Safety (BMCS), *see* 49 C.F.R. § 396 (1981).[8] Indeed, trial testimony established that "motor carriers typically inspect their vehicles from 4 to 12 times per year depending upon vehicle usage, region of the country, and other factors," 515 F.Supp. at 1332. The appropriate inquiry, therefore, at least under the balancing test, is not whether annual or semi-annual examinations of otherwise-uninspected trucks will increase highway safety, but rather whether the *incremental* (and arguably cumulative) inspections mandated by Pennsylvania will be accompanied by safety gains of a magnitude sufficient to justify the rather sizeable restrictions placed on interstate commerce by the statute.

Despite the mass of evidence introduced by both sides, the record is barren of any indication that the Commonwealth's periodic inspection requirement will lead to a significant decrease in the accident rates for motor carrier vehicles. As the district court observed, because inspections "will only detect the condition of the vehicle at the time the inspection is made," and because structural and mechanical deterioration occurs "slowly and progressively" over time, "[m]echanical failures can and do occur without warning and despite inspection of the vehicle." *Id.* at 1332, 1338. From this and other evidence, the district court concluded that "inspections do not lead to a reduction in accidents caused by mechanical

---

7. Additionally, although the district court made no specific findings with respect to these charges, the record contains other, generally unrebutted, allegations as to burdens imposed on interstate commerce by the Commonwealth's inspection requirement: many companies would be forced to purchase additional vehicles in order to prevent a diminution or cessation of service during the time when their existing trucks are being inspected; it is questionable whether the Commonwealth has a sufficient number of service stations to handle the marked increase in periodic inspections; because of "prohibitive" costs associated with the inspection process, a number of trucking companies allegedly would be forced to discontinue or suspend service to Pennsylvania and other east coast areas, leading to greater unemployment in the region; many companies reported the costs they expected to incur in complying with the Pennsylvania law to be far in excess of the $150,000 figure identified by Coastal as its annual cost.

8. According to the district court, "[u]nder BMCS regulations, every motor carrier must require its drivers to prepare a report at the completion of each day's work with the vehicle covering [specified] parts and accessories"; "[a]ny defects or deficiencies affecting the safety of operation of the motor vehicle or resulting in its mechanical breakdown must be reported by the driver"; "[b]efore a driver takes out a motor carrier vehicle, he must ... visually inspect it, satisfy himself that it is in safe operating condition, review the most recent inspection report carried on the vehicle, and sign the report only if ... [the] safety-related defects or deficiencies have been repaired." *American Trucking, supra,* 515 F.Supp. at 1332.

**806**

failures." *Id.* at 1332. While such a conclusion might be somewhat overstated, unlike the majority I do not believe it is clearly erroneous, given that the far more frequent BMCS-mandated inspections currently required are unable to prevent many defect-related accidents.

In this connection, it is worth noting that the Commonwealth's own Report on Motor Vehicle Inspection, dated January 1981, concluded that "it is unlikely that [periodic motor vehicle inspection] actually can prevent those outages or failures, or substantially reduce the number of frequently occurring component defects existing in vehicles in use on public highways." According to the Report, "this study confirms the findings of several others which have concluded that accident rates among states with annual and semiannual inspections are essentially the same as those in states with no vehicle inspection programs." *Id.* at 1331 n.17 & 1332 n.23. As the majority notes, *see* at 797–798, this report questioned the virtue of inspections for all vehicles— including, but not specifically considering, trucks—and therefore may not be directly on point. Nonetheless, in my view, the study's findings serve to buttress the conclusions about truck inspections drawn from the record in this case by the district court.[9]

I am not persuaded, moreover, by three evidentiary items relied on by the Commonwealth in support of its argument that periodic inspections will reduce motor carrier vehicle accident rates. First, for the reasons identified by the district court, *see American Trucking, supra,* 515 F.Supp. at 1330 n.13, the results of various on-site examinations conducted by BMCS and Pennsylvania do not demonstrate that mandatory inspections increase highway safety. As the majority recognizes, at 799, all of these surveys "suffer from serious flaws which undermine their utility." Second, Pennsylvania—and the majority, *see id.* —emphasize that 8.8% of the tractor-trailers involved in accidents in the Commonwealth in 1979 had a vehicle failure cited as a contributing cause. This statistic does no more than state the problem, however; nothing in the record indicates that the percentage will decrease once additional (and arguably cumulative) vehicle inspections are under way. Finally, Pennsylvania—and the majority, *see id.* at 798 stress expert testimony to the effect that potential mechanical failures can be detected by an inspection and that the Commonwealth's envisioned program "will detect, prevent, [and] correct conditions before they reach the final stage of failure." Appendix at 666, 684. This testimony, while of course helpful to the Commonwealth, does not go to what I consider to be the crucial question: whether the newly ordered inspections will increase highway safety *to a degree sufficient to justify the sizeable burdens placed on interstate commerce by the statute.*

In sum, in the absence of a showing on the part of the Commonwealth that its inspection effort, if implemented, would measurably decrease the number of accidents involving interstate trucks, I would hold that, under the balancing test, the undisputed burdens on interstate commerce resulting from Pennsylvania's inspection program outweigh what the district court found to be speculative and unsubstantiated promises of improved highway safety.[10]

---

**9.** The fact that the Report was not introduced into evidence, and therefore arguably cannot be employed to support a holding, does not mean a court is without power to use this public document, as did the district court, to corroborate an already-arrived-at result.

**10.** I am constrained to note that, if I agreed with the majority that the deferential standard of commerce clause review is preferable to the balancing test, in my opinion Pennsylvania would prevail on this appeal. While I believe that the evidence proffered by the Commonwealth in support of its inspection proposal is insufficient to offset the truckers' showing of a sizeable negative impact on interstate commerce, I simply cannot conclude that the safety benefits to be realized by the Pennsylvania legislation are "illusory" or "demonstrably trivial" (quoting *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 692, 101 S.Ct. 1309, 1327, 67 L.Ed.2d 580 (1982) (Rehnquist, J., dissenting)). The majority implies, *see* at 795, that selection of the appropriate level of review in this matter is "outcome determinative." I agree.

## III

For more than a century, the Supreme Court has recognized that, under certain circumstances, the commerce clause can serve as an affirmative limitation on the regulatory powers of the states, even in the absence of preemptive national legislation in a particular area. *See, e.g., Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851); *The Passenger Cases*, 48 U.S. (7 How.) 283, 12 L.Ed. 702 (1849). In the words of Justice Frankfurter,

> the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States.... [T]he Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States.

*Freeman v. Hewit*, 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946).

There can be no doubt that Pennsylvania, like every other state, has an interest in increasing the safety of its highways; there also can be no doubt that the Commonwealth is entitled to "great leeway" in acting to realize this objective. *See Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 111, 69 S.Ct. 463, 93 L.Ed. 533 (1949). In the *Bibb-Raymond Motor-Kassel* trilogy,

however, the Supreme Court stressed that, even in the traditionally local domain of highway safety regulation, states cannot unduly fetter commercial interchange within the Union. As a result of today's decision, Pennsylvania will be the only state in the nation to restrict access to its highways to those trucks that have received a state-sponsored safety inspection.[11] In my view, this action will have a considerable negative impact on interstate commerce, and Pennsylvania has been unable to demonstrate safety benefits sufficient to offset this burden. Accordingly, I conclude that "[t]his is one of those cases—few in number—where local safety measures that are nondiscriminatory place an unconstitutional burden on interstate commerce." *Bibb, supra*, 359 U.S. at 529, 79 S.Ct. at 967. Thus, I respectfully dissent.

[11]. "A State which insists on a design out of line with the requirements of almost all the other States may sometimes place a great burden of delay and inconvenience on those interstate motor carriers entering or crossing its territory. Such a new safety device—out of line with the requirements of the other States—may be so compelling that the innovating State need not be the one to give way. But the present showing—balanced against the clear burden on commerce—is far too inconclusive." *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529–30, 79 S.Ct. 962, 967–68, 3 L.Ed.2d 1003 (1959).